**DEFENDANT'S NOTICE OF REMOVAL**

# EXHIBIT 1

# Copy of all filings in the State Court Action

*Daniel J. Stermer, as Receiver for National Senior Insurance, Inc. d/b/a Seeman Holtz, et al.*
*v. Wells Fargo Bank, N.A.*
**U.S. District Court, Southern District of Florida, West Palm Beach Division**

# JOSEPH ABRUZZO
### CLERK OF THE CIRCUIT COURT & COMPTROLLER
PALM BEACH COUNTY

**CASE NUMBER: 50-2024-CA-004345-XXXA-MB**
**CASE STYLE: STERMER, DANIEL J V WELLS FARGO BANK NA**
ACCESS LEVEL: D

| Search Criteria | Search Results | Case Info | Party Names | Dockets & Documents | Case Fees | Court Events |

View documents and order certified copies*. See our eCaseView FAQ for step-by-step guidance and information about what documents are available online.

**Document Icons**

📄 Document available. Click icon to view.
🛒 Add a certified copy of the document to your shopping cart.
🔒 Document is Viewable on Request (VOR). Click to request.
⏱ VOR document is being reviewed. Click to be notified when available.

**0**

Public = 📄        VOR = 🔒        In Process = ⏱        Page Size: 25

| | DIN | Effective Date | Description | Notes |
|---|---|---|---|---|
| 📄 🛒 | 2 | 05/09/2024 | CIVIL COVER SHEET | |
| 📄 🛒 | 3 | 05/09/2024 | COMPLAINT | FB PLTF |
| 📄 🛒 | 4 | 05/09/2024 | NOTICE OF RELATED CASE AND FILING OF ORDER ESTABLISHING PROCEDURES GOVERNING RECOVERY ACTIONS TO BE COMMENCED BY THE RECEIVER; FB PLTF | OF RELATED CASE AND FILING OF ORDER ESTABLISHING PROCEDURES GOVERNING RECOVERY ACTIONS TO BE COMMENCED BY THE RECEIVER; FB PLTF |
| 📄 🛒 | 5 | 05/09/2024 | SUMMONS ISSUED | ggaukroger@bergersingerman.com;drt@bergersingerman.com;ablanco@bergersingerman.com WELLS FARGO BANK NA TO BE SERVED |
| | 1 | 05/13/2024 | DIVISION ASSIGNMENT | AE: Circuit Civil Central - AE (Civil) |
| 📄 🛒 | 6 | 05/13/2024 | PAID $411.00 ON RECEIPT 5325851 | $411.00 5325851 Fully Paid |

| | | | | | |
|---|---|---|---|---|---|
|  |  | 7 | 05/14/2024 | DCM DESIGNATION TO THE STREAMLINE TRACK WITH NON-JURY TRIAL ORDER | BRADLEY G. HARPER 05/14/2024 |
| | | 8 | 05/15/2024 | NOTICE NOTICE OF ACCEPTANCE OF SERVICE OF PROCESS | NOTICE OF ACCEPTANCE OF SERVICE OF PROCESS |

517-47ff8cbf-586e-4c74-a47a-a3506f89e0b5



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 6/6/2024 12:43:11 PM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H |
| **Case Number:** | 502024CA004345XXXAMB |
| **Case Docket:** | COMPLAINT |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

\*\*The web address shown above contains an embedded link to the verification page for this particular document.



Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 1 of 84

### IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
### IN AND FOR PALM BEACH COUNTY, FLORIDA
### CIVIL DIVISION

DANIEL J. STERMER, as Receiver for           CASE NO. _____
NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
CENTURION ISG SERVICES, LLC
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,

         Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

         Defendant.

_____/

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION,

         Plaintiff,

v.                  CASE NO.: 50-2021-CA-008718-XXXX-MB

NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
MARSHAL SEEMAN,
CENTURION INSURANCE SERVICES GROUP, LLC,
BRIAN J. SCHWARTZ,
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 05/09/2024 04:36:39 PM

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT
THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER,
PALM BEACH COUNTY.

VISIT https://appsgp.mypalmbeachclerk.com/Services/EcertifyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT



Digitally signed by The Honorable Joseph Abruzzo
Date: 2024.06.06 12:44:05 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 2 of 84

PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY 2019-6, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,
ALTRAI GLOBAL, LLC A/K/A ALTRAI HOLDINGS, LLC,
VALENTINO GLOBAL HOLDINGS, LLC,
AMERITONIAN ENTERPRISES, LLC,
SEEMAN-HOLTZ CONSULTING CORP.,
CENTURION ISG Holdings, LLC,
CENTURION ISG Holdings II, LLC,
CENTURION ISG (Europe) Limited,
CENTURION ISG SERVICES, LLC,
CENTURION ISG FINANCE GROUP, LLC,
CENTURION FUNDING SPV I LLC,
CENTURION FUNDING SPV II LLC,
GRACE HOLDINGS FINANCIAL, LLC,
PRIME SHORT TERM CREDIT INC.,

     Defendants.

THE ESTATE OF ERIC CHARLES HOLTZ,
SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC
F/K/A SEEMAN HOLTZ PROPERTY AND CASUALTY, INC.,
SHPC HOLDINGS I, LLC,

     Relief Defendants.

_____/

## COMPLAINT
## (SUPPLEMENTAL PROCEEDING)

Receiver Daniel J. Stermer, solely in his capacity as the Court-appointed Receiver

("Receiver") for NATIONAL SENIOR INSURANCE, INC. D/B/A SEEMAN HOLTZ, a Florida

corporation, CENTURION INSURANCE SERVICES GROUP, LLC, an Ohio limited liability

company, EMERALD ASSETS 2018, LLC, a Georgia limited liability company, INTEGRITY

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 3 of 84

ASSETS 2016, LLC, a Georgia limited liability company, INTEGRITY ASSETS, LLC, a Georgia limited liability company, PARA LONGEVITY 2014-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2015-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2015-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2016-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2016-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2018-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2018-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2019-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2019-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2019-6, LLC, a Georgia limited liability company, PARA LONGEVITY VI, LLC, a Georgia limited liability company, SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC, a Georgia limited liability company, VALENTINO GLOBAL HOLDINGS, LLC, a Delaware limited liability company, AMERITONIAN ENTERPRISES, LLC, an Ohio limited liability company, SEEMAN-HOLTZ CONSULTING CORP., a Florida corporation, CENTURION ISG Holdings, LLC, a Delaware limited liability company, CENTURION ISG Holdings II, LLC, a Delaware limited liability company, CENTURION ISG (Europe) Limited, a foreign entity, CENTURION ISG SERVICES, LLC, a Florida limited liability company, CENTURION ISG FINANCE GROUP, LLC, a Delaware limited liability company, CENTURION FUNDING SPV I LLC, a Delaware limited liability company, CENTURION FUNDING SPV II LLC, a Delaware limited liability company, PARA GLOBAL 2019, LLC, a Georgia limited liability company, ALLOY ASSETS, LLC, a Florida limited liability company, SEEMAN HOLTZ WEALTH MANAGEMENT, INC., a Florida corporation, AGENCY ACQUISITION FUNDING, LLC, a Delaware limited liability company, AMERICA'S FAVORITE INSURANCE SERVICES LLC, a Delaware limited liability company, and GRACE

Unique Code : CAA-FBH-BCAJ-CBDCAJHGE-JCAFIE-H Page 4 of 84

HOLDINGS FINANCIAL, LLC, a Delaware limited liability company (collectively, the "Consenting Corporate Defendants" or "Receivership Entities"), sues Wells Fargo Bank, N.A. ("Wells Fargo" or the "Defendant"), on behalf of the Receivership Entities NATIONAL SENIOR INSURANCE, INC. D/B/A SEEMAN HOLTZ, CENTURION ISG SERVICES, LLC, EMERALD ASSETS 2018, LLC, INTEGRITY ASSETS 2016, LLC, INTEGRITY ASSETS, LLC, PARA LONGEVITY 2014-5, LLC, PARA LONGEVITY 2015-3, LLC, PARA LONGEVITY 2015-5, LLC, PARA LONGEVITY 2016-3, LLC, PARA LONGEVITY 2016-5, LLC, PARA LONGEVITY 2018-3, LLC, PARA LONGEVITY 2018-5, LLC, PARA LONGEVITY 2019-3, LLC, PARA LONGEVITY 2019-5, LLC, PARA LONGEVITY VI, LLC, SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC (collectively with the Receiver, the "Plaintiffs"), pursuant to paragraph 8(s), 42, 43, and 44 of the *Order Appointing Receiver* dated May 12, 2023 ("Receivership Order") and alleges as follows:

## I.   **INTRODUCTION**

1.      This is an action against Wells Fargo for aiding and abetting a Ponzi scheme orchestrated by Marshal Seeman, Eric Holtz, and Brian Schwartz resulting in the loss of more than $300,000,000 to more than a thousand victims, many of whom were elderly, retired, and/or unaccredited investors (the "Para Longevity Scheme"), for aiding and abetting breach of fiduciary duty, aiding and abetting fraud, negligence, and unjust enrichment.

2.      The Para Longevity Companies[1] were used to sell unregistered securities in the form of secured promissory notes ("Notes"), that were purportedly secured by viatical life policies

---

[1] The Para Longevity Companies are a subset of the Receivership Entities used to defraud unwitting investors in the Para Longevity Scheme, which includes EMERALD ASSETS 2018, LLC, a Georgia limited liability company, INTEGRITY ASSETS 2016, LLC, a Georgia limited liability company, INTEGRITY ASSETS, LLC, a Georgia limited liability company, PARA

Investors were misled regarding the profitability of the Para Longevity Companies, the existence of sufficient life insurance policies and other assets securing their investments, and the perfection of security interests in those assets.

3.     Most of the investors in the Notes have lost their entire investment which, in some instances, was their life's savings. Many of the investors have no other income, subsist almost exclusively off Social Security benefits, and are now struggling desperately to find the means to sustain their livelihood.

4.     In turn, NSI, the Para Longevity Companies and the other Receivership Entities themselves have also been substantially damaged by the rogue operators of the Para Longevity Scheme and their aider and abettor, Wells Fargo, having had their assets stolen, the life insurance policies they purchased or should have purchased pledged and ultimately foreclosed on by third parties, and their bank accounts pilfered by the Ponzi scheme's operators.

5.     From at least 2009 until the Florida Office of Financial Regulations ("OFR") uncovered the Para Longevity Scheme in 2021, Wells Fargo provided substantial assistance and

---

LONGEVITY 2014-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2015-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2015-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2016-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2016-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2018-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2018-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2019-3, LLC, a Georgia limited liability company, PARA LONGEVITY 2019-5, LLC, a Georgia limited liability company, PARA LONGEVITY 2019-6, LLC, a Georgia limited liability company, PARA LONGEVITY VI, LLC, a Georgia limited liability company, SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC, a Georgia limited liability company,  ALLOY ASSETS, LLC, a Florida limited liability company, CENTURION ISG SERVICES, LLC, a Florida limited liability company, CENTURION ISG FINANCE GROUP, LLC, a Delaware limited liability company, and GRACE HOLDINGS FINANCIAL, LLC, a Delaware limited liability company. In addition, there are other related entities, which are not currently Receivership Entities (collectively, the "non-Receivership Para Longevity Companies"), which had accounts at Wells Fargo, raised money from the sale of Notes to investors, and were also the instrumentalities and victims of the Ponzi scheme aided and abetted by Wells Fargo's conduct as alleged herein.

Unique Code : CAA-FBH-BCAJ-CBDCAJHGE-JCAFIE-H Page 5 of 84

Unique Code : CAA-FBH-BCAJ-CBDCAJHGE-JCAFIE-H Page 6 of 84

services in furtherance of the Para Longevity Scheme, including, *inter alia*, as the trustee ("Trustee") of the irrevocable life insurance trusts ("ILITS") that owned the life insurance policies, and later as securities intermediary ("Securities Intermediary") for the life insurance policies, as well as having opened 31 bank accounts for the Receivership Entities (including 15 for the Plaintiff Para Longevity Companies).

6.      Based on its roles and obligations as herein alleged, Wells Fargo knew, or should have known, as Trustee and Securities Intermediary for the life insurance policies, and banker, and due to its Know Your Customer ("KYC") obligations and the extensive list of services provided to the Para Longevity Companies and non-Receivership Para Longevity Companies, that the Para Longevity Companies and non-Receivership Para Longevity Companies were supposed to use investor money to purchase and pay the premiums on life insurance policies, the proceeds from the death benefits of which would be used to pay the investors their interest and eventually return their principal.

7.      As a Trustee, Securities Intermediary, bank, and credit card issuer,[2] Wells Fargo monitored the activities of the Receivership Entities and knew, or should have known, that the Para Longevity Companies and non-Receivership Para Longevity Companies were being used to perpetrate the Para Longevity Scheme.

8.      Wells Fargo knew, or should have known, that the Para Longevity Companies and non-Receivership Para Longevity Companies were formed to purchase and pay premiums to

---

[2] Wells Fargo also issued a credit card to a non-Receivership Para Longevity Company, Integrity Longevity Investment, LLC, which was used by Seeman for extensive personal use, including charges for thousands of dollars in gambling debts to FanDuel, despite being a company which should have purchased life insurance policies. Moreover, the Wells Fargo credit card balances were often paid by other Para Longevity Companies or NSI.

Unique Code : CAA-FBH-BCAJ-CBDCAJHGE-JCAFIE-H Page 7 of 84

maintain life insurance policies using the funds they raised from investors. Yet, Wells Fargo watched as the funds raised by the Para Longevity Companies and non-Receivership Para Longevity Companies were repeatedly diverted and used to pay interest and principal to investors holding Notes in earlier Para Longevity Companies, transferred among the Para Longevity Companies and non-Receivership Para Longevity Companies themselves to then be diverted for improper purposes, and transferred to the Centurion Companies[3] without consideration. Wells Fargo also knew that the same life insurance policies that the Para Longevity Companies and non-Receivership Para Longevity Companies pledged to back the Notes were additionally pledged as collateral for loans to the Centurion Companies from unrelated third party lenders.

9.     At base, Wells Fargo knew, or should have known, of the Ponzi scheme and extensive fraud because it served as the Securities Intermediary for Centurion Companies' life settlement policies and as the bank for the Para Longevity Companies and certain other non-Receivership Para Longevity Companies and was thus obligated to and did monitor the movement of the hundreds of millions of dollars involved. Like the rogue insiders of the Receivership Entities, Wells Fargo saw it all happen in real time. Indeed, Wells Fargo was uniquely positioned not only to see both sides of the Para Longevity Scheme – the transaction activity within the Para Longevity Companies' bank accounts and the life insurance policies they were purportedly investing in as Securities Intermediary to the Centurion Companies – but also to prevent it.

---

[3] The "Centurion Companies" are a subset of the Receivership Entities that were created to own or service the life settlement policies purchased with funds converted from the Para Longevity Companies and non-Receivership Para Longevity Companies, which includes CENTURION INSURANCE SERVICES GROUP, LLC, an Ohio limited liability company, CENTURION ISG Holdings, LLC, a Delaware limited liability company, CENTURION ISG Holdings II, LLC, a Delaware limited liability company, CENTURION ISG (Europe) Limited, a foreign entity, CENTURION FUNDING SPV I LLC, a Delaware limited liability company, CENTURION FUNDING SPV II LLC, a Delaware limited liability company.

10.     Wells Fargo knew that the Para Longevity Companies' and non-Receivership Para Longevity Companies' bank accounts were for a "fund that buys life policies," which is also what investors were told. Unbeknownst to the investors, but known by Wells Fargo, the Centurion Companies were borrowing large sums of money from lenders to do the same thing.

11.     Wells Fargo knew, or should have known, that the Para Longevity Companies, non-Receivership Para Longevity Companies, and the Centurion Companies comingled and transferred investor money between the Wells Fargo bank accounts without any legitimate purpose or financial arrangement.

12.     Wells Fargo knew, or should have known, that the investments solicited through certain Para Longevity Companies and non-Receivership Para Longevity Companies were being used to pay back investors in earlier Para Longevity Companies and non-Receivership Para Longevity Companies.

13.     Wells Fargo knew that the Centurion Companies' lenders took a preferred security interest in the life insurance policies that purportedly secured the investments of the investors in the Para Longevity Companies and non-Receivership Para Longevity Companies.

14.     Wells Fargo knew that certain creditors of the Centurion Companies had previously foreclosed on the same life insurance policies that were purportedly securing the funds solicited from the Para Longevity Companies' and non-Receivership Para Longevity Companies' investors.

15.     Wells Fargo knew and willfully ignored that checks issued by the Para Longevity Companies and non-Receivership Para Longevity Companies were routinely flagged for insufficient funds.  Incredibly, the bank accounts at Wells Fargo were also overdrawn no less than *1,400 times* during the period those accounts were open which generated overdraft notifications from Wells Fargo.

16.     Wells Fargo had a bird's eye view of the Para Longevity Scheme, enabled it, and did nothing to stop it despite having a clear duty and ability to do so. As a result, more than a thousand victims (primarily elderly, unaccredited investors of limited financial means) lost more than a quarter billion dollars.

17.     By recklessly pursuing its objectives to maximize assets held, and to generate account and transfer-related revenue and compensation, Wells Fargo and its employees substantially assisted the Para Longevity Scheme's fraud, misuse, and misappropriation of assets by allowing the Para Longevity Scheme to continue operating.

18.     Wells Fargo – as a bank, Trustee and the Securities Intermediary –enabled the Ponzi scheme to reach catastrophic levels.

19.     Repeatedly, Seeman initiated wire transfers among the Para Longevity Companies and non-Receivership Para Longevity Companies bank accounts and then personally directed Wells Fargo to complete the transfers.

20.     Without Wells Fargo's substantial assistance in facilitating the Para Longevity Scheme it would have stopped, leaving the Receivership Entities with significant funds and assets that could have been used for legitimate, profit-generating investments or simply held to later return to investors.

21.     But with Wells Fargo's assistance, the Para Longevity Scheme went uninterrupted until the OFR intervened.

22.     Now, in addition to the substantial damages and losses caused by the Para Longevity Scheme and Wells Fargo's conduct, the Receivership Entities, including the Plaintiffs in this case, face a significant, nine-figure liability to the victims of a scheme that would not have been possible but for the actions and inactions of Wells Fargo.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H  Page 10 of 84

## II.    <u>JURISDICTION, VENUE, PARTIES AND RELEVANT NON-PARTIES</u>

23.    This Court has subject matter jurisdiction over this action because the amount in controversy exceeds $50,000, exclusive of attorney's fees and costs. Fla. Constitution, Article V, sections 1 and 5 and Section 26.012, Florida Statutes.

24.    The Court has specific personal jurisdiction over Wells Fargo because the Receiver's claims arise out of Wells Fargo's activity and unlawful conduct in Florida, and general personal jurisdiction over Wells Fargo because Wells Fargo regularly conducts business and maintains numerous branches in Florida.

25.    Venue is proper in this Court because the acts and omissions at issue took place within Palm Beach County in the State of Florida and the filing of this complaint is authorized by the Receivership Order, which relates to proceedings currently pending before this Court in Palm Beach County, Florida; namely, *State of Florida Office of Financial Regulation v. National Senior Insurance, Inc. et al.*, Case No. 502021CA008718-XXXX-MB (the "<u>OFR Case</u>"), and Wells Fargo transacts business and may be found in Palm Beach County.

26.    On September 5, 2023, the Court entered an *Order Establishing Procedures Governing Recovery Actions to Be Commenced by the Receiver* (the "<u>Procedures Order</u>") attached hereto as **<u>Exhibit "A"</u>**, establishing certain procedures governing the actions filed by the Receiver, including the assignment of this supplemental proceeding to Judge Bradley Harper, Circuit Court Judge, presiding over the OFR Case.

27.    All conditions precedent to this action have occurred, been performed, or have been waived.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 11 of 84

**A.   The Receiver**

28.   The Receiver is a natural person over the age of 21 and otherwise *sui juris* and is a resident of the State of Florida. The Receivership Entities were businesses registered to do business in the State of Florida, Delaware, Georgia and Ohio and operated from the same address at 301 Yamato Road, Boca Raton, Florida. The Receiver is authorized to bring this action on behalf of the Receivership Entities pursuant to the Receivership Order, particularly at paragraphs 8(s), 42, 43, and 44.

**B.   Defendant**

29.   Wells Fargo is a nationally chartered bank, headquartered in Sioux Falls, South Dakota, and with its principal place of business in San Francisco, California. Wells Fargo is one of the largest banks in the United States, providing banking products and services to businesses, customers, and institutions in all 50 states, including at branches within Palm Beach County, Florida, and boasting over $19 billion in net income for 2023.

**C.   Nonparties**

30.   Marshal Seeman ("Seeman") is a resident of Florida. Seeman was a principal of the Receivership Entities and Seeman Holtz Property and Casualty, LLC f/k/a Seeman Holtz Property and Casualty, Inc. ("SHPC"), who acted as their Chief Executive Officer.

31.   Eric Holtz ("Holtz") was a resident of Florida[4]. Holtz was a principal of the Receivership Entities and SHPC, who acted as the head of marketing and sales, as well as the Executive Vice President of the Para Longevity Companies' and non-Receivership Para Longevity Companies' financial advisory practice.

---

[4] Holtz committed suicide on June 11, 2021.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 12 of 84

32.    Brian Schwartz ("Schwartz") was a resident of Florida[5]. Schwartz was a principal of the Receivership Entities and SHPC, who acted as the head of finance and accounting.

33.    Alan Hodge ("Hodge") is a resident of Florida. Hodge served in the role as in-house counsel to the Receivership Entities, who acted as the chief of compliance and legal counsel.

### III.    BACKGROUND REGARDING THE RECEIVERSHIP

#### A.    The OFR Complaint

34.    On July 12, 2021, the State of Florida, OFR filed a *Complaint for Temporary and Permanent Injunction, Appointment of Receiver, Restitution, Civil Penalties, and Other Statutory and Equitable Relief,* (the "OFR Complaint") against thirty corporate defendants, two individual defendants and three relief defendants as set forth in the above case caption, seeking to restrain acts and practices of said defendants in violation of various provisions of Chapter 517, Florida Statutes, including sections 517.301, 517.12 and 517.07, and "halt the securities fraud scheme and common enterprise operated and controlled by Marshal Seeman ("Seeman") and Seeman's deceased business partner, Eric Charles Holtz ("Holtz")."

35.    The OFR Complaint alleges that Seeman and Holtz were assisted in the scheme and enterprise (referred to therein as the "SH Enterprise") by Schwartz, who acted as the SH Enterprise's untitled chief financial officer.

36.    The OFR Complaint further alleges that as part of the SH Enterprise, Seeman, Holtz, and Schwartz ("SH&S") created and operated a myriad of corporate entities; that the SH Enterprise raised more than $400,000,000 since 2009 through the sale of unregistered securities in the form of purportedly secured note purchase agreements and promissory notes, which were purportedly secured by viaticated life settlement policies and other insurance-related assets; that

---

[5] Schwartz committed suicide on April 12, 2023.

investors were misled regarding the SH Enterprise's profitability, the existence of sufficient life settlement policies and other assets securing their investments and the perfection of security interests in those assets; and that the SH Enterprise was a "Ponzi-like scheme" in which new investor monies were commingled within the common enterprise and used to repay prior investors in the ongoing scheme, thereby providing the appearance of profitability.

**B.     The Corporate Monitorship and Subsequent Receivership.**

37.     On September 9, 2021, the OFR filed a *Consent Motion for Appointment of Corporate Monitor*, seeking the appointment of the Corporate Monitor for the property, assets, and businesses of the initial Consenting Corporate Defendants, as well as a temporary injunction against the Consenting Corporate Defendants and Seeman and Schwartz.

38.     On September 14, 2021, the Court entered an *Agreed Order Granting Plaintiff's Consent Motion for Appointment of Corporate Monitor and Related Injunctive Relief* (the "September 14, 2021 Order"), thereby approving and appointing Daniel J. Stermer as the Corporate Monitor for the Consenting Corporate Defendants and their affiliates, subsidiaries, successors, and assigns, until further Order of the Court (such proceeding, the "Corporate Monitorship").

39.     The Court expanded the scope of the Corporate Monitorship to include five (5) additional corporate entities as Consenting Corporate Defendants by way of an agreed order dated January 6, 2022 (together with the September 14, 2021 Order, the "Appointment Orders").

40.     On March 23, 2023, the OFR and the Corporate Monitor filed their *Joint Motion To Appoint Receiver* (the "Joint Motion") which, in pertinent part, provided for the appointment of Daniel J. Stermer as the Receiver of the Receivership Entities (*i.e.*, formerly the Consenting Corporate Defendants).

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 14 of 84

41.     On May 12, 2023, the Court entered the Receivership Order (*Order Appointing Receiver*), providing that Daniel J. Stermer serve as Receiver for the Receivership Entities and their respective affiliates, subsidiaries, successors, and assigns (individually, each a "Receivership Estate," and collectively, the "Receivership Estates").   Grace Holdings Financial, Inc. was subsequently added to the receivership by further Court order in November 2023 and is one of the Receivership Entities in the Receivership Estate.

42.     The Receiver's authority to pursue the claims set forth in this Complaint are set forth in the Receivership Order:

> 6.   …The Receiver shall assume and control the operations of the Receivership Defendants and shall pursue and preserve all of their claims.
>
> 8.   The Receiver shall have the following general powers and duties:
> ---
> b.   ….; to sue for and collect, recover, receive and take into possession from third parties property of the Receivership Defendants….
> ---
> i.   Pursue, resist, defend and settle all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receivership Defendants; ….
>
> j.   ….The Receiver shall have full power to sue for, collect, receive and take possession of all goods, chattels, rights, credits, moneys….
> ---
> s.     Initiate, defend, compromise, adjust, intervene in, dispose of, or become a party to any lawsuits or arbitrations in state, federal or foreign jurisdictions necessary to preserve or increase the assets of the Receivership Defendants and/or on behalf of the Receivership Defendants and for the benefit of its creditors against: (1) those individuals and/or entities which the Receiver may claim have wrongfully, illegally or otherwise improperly misappropriated, transferred or received any assets, properties, equipment, inventory, or financing relating to the foregoing, monies, proceeds or other items of value directly or indirectly traceable from the Receivership Defendants, including but not limited to each of their respective officers, directors, managers, employees, partners, representatives, agents, brokers, advisors or any persons acting in concert or

14

participation with them; or (2) any transfers of assets, properties, equipment, inventory, or financing relating to the foregoing, monies, proceeds or other items of value directly or indirectly traceable from the creditors of the Receivership Defendants. Such actions may include, but not be limited to, seeking imposition of constructive trusts, seeking imposition of equitable liens, unjust enrichment, breach of fiduciary duties, disgorgement of commissions and/or profits, recovery and/or avoidance of fraudulent transfers under Florida Statute § 726.101, *et seq.* or otherwise, rescission and restitution, the collection of debts, and such Orders or other relief supported in law or equity from this Court as may be necessary to enforce this Order;

42. In accordance with all applicable Florida Statutes, and common law, the Receiver is authorized, empowered and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, settle, and/or adjust actions in any state, federal or foreign court or proceeding of any kind, including the action captioned above, as may in the Receiver's discretion be advisable or proper to recover and/or conserve any receivership property. By this authorization and empowerment, this Court specifically finds and holds that the Receiver is not and shall not be barred from bringing any of the foregoing proceedings or subject to defenses by third-parties due to the doctrine *in pari* delicto.

43. The Receiver may initiate such actions and legal proceedings, for the benefit and on behalf of the Receivership Estates, as the Receiver deems necessary and appropriate.

44. Further, as to any claim or cause of action accrued or accruing in favor of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action. For the avoidance of doubt, the period of time from September 14, 2021, through the date of the entry of the Receivership Order should be excluded from the computation of any statute of limitations applicable to a cause of action accrued or accruing in favor of the Receivership Defendants. The timing of the Receiver's knowledge, discovery, or duty to discover facts for purposes of third-party claims would commence upon the entry of the order appointing the Receiver

43. In accordance with Chapters 605 and 607, Florida Statutes, including §605.0704, §605.0709, §607.1405 and §607.1432, the Receiver is authorized, empowered and directed to investigate, prosecute, defend, intervene in or otherwise participate in, compromise, settle, and/or

15

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 16 of 84

adjust actions in any state, federal or foreign court or proceeding of any kind, including the action captioned above, as may in the Receiver's discretion be advisable or proper to recover and/or conserve any receivership property.

44.    The Receiver is empowered to instigate such actions and legal proceedings, for the benefit and on behalf of the Receivership Estate, as the Receiver deems necessary and appropriate.

45.    Pursuant to paragraph 44 of the Receivership Order, "the period of time from September 14, 2021, through the date of the entry of the Receivership Order [May 12, 2023] should be excluded from the computation of any statute of limitations applicable to a cause of action accrued or accruing in favor of the Receivership Defendants."

46.    The grant of powers and duties set forth in the Receivership Order which authorize the Receiver to commence this action against Wells Fargo on behalf of the Receivership Estate in this Court, is consistent with Sections 605.0704 and 607.1434, Florida Statutes.

## IV.    FACTUAL ALLEGATIONS

**A.    The Receivership Entities and Para Longevity Scheme**

47.    Prior to its demise, Seeman and Holtz created and ran one of the largest insurance conglomerates in Florida.

48.    As early as the mid-2000's, Seeman and Holtz were active in buying and selling life settlements in addition to the principal business of selling life insurance and other insurance products though National Senior Insurance, Inc. ("NSI") and SHPC, from offices in Boca Raton, Florida.

49.    NSI sold life insurance, annuities, structured settlements, and other insurance related products, and held itself out as a wealth manager, as a "leader in pre and post-retirement

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 17 of 84

planning," and a "comprehensive advisory." NSI was a preeminent insurance agency with a significant stream of legitimate revenue.

50.     SHPC sold property and casualty insurance products and grew rapidly through the acquisitions of smaller property and casualty insurance companies. SHPC was a preeminent property and casualty insurance products company with a significant stream of legitimate revenue.

51.     Seeman and Holtz also created the Para Longevity Companies and non-Receivership Para Longevity Companies to solicit funds from investors to fund the purchase and payment of premiums for life settlement policies.

52.     Each of the Para Longevity Companies and non-Receivership Para Longevity Companies solicited funds through a private placement memorandum ("PPM") and by selling promissory notes to investors ("Notes"), none of which was registered with the OFR.

53.     Each of the Para Longevity Companies and non-Receivership Para Longevity Companies used a PPM in connection with each of the offerings which described the purported investment opportunity, risk of loss, and other material matters.

54.     The PPMs acknowledged that the Notes were securities subject to state and federal securities laws and indicated that only "accredited investors" were eligible to purchase the securities.

55.     The Notes are securities as defined by Section 517.021(22), Florida Statutes.

56.     The Notes were not exempt from registration with OFR pursuant to Section 517.051, Florida Statutes; neither were the Notes offered and sold in transactions that were exempt from registration with OFR pursuant to Section 517.061, Florida Statutes; nor were the Notes a federal covered security, as defined by Section 517.021(10), Florida Statutes.

57.     At all material times, the Notes were not registered with the OFR.

58.     For each of the investments in the Para Longevity Companies and non-Receivership Para Longevity Companies, the Notes sold to investors contained substantially similar material terms.

59.     Each investor's Note from the Para Longevity Companies and non-Receivership Para Longevity Companies required the Para Longevity Companies and non-Receivership Para Longevity Companies to pay interest to the investor over a certain period of time.

60.     Upon maturity of the Notes, the Para Longevity Companies and non-Receivership Para Longevity Companies agreed to return to the investors the original principal amount invested.

61.     The investment period on the Notes ranged from between 4 to 60 months, with the average being slightly over 30 months.

62.     Many investors of the Para Longevity Companies and non-Receivership Para Longevity Companies were originally clients of NSI or SHPC, who were diverted by the perpetrators of the Para Longevity Scheme, primarily Holtz and Seeman, from investing in legitimate insurance-based financial products to invest in of the Para Longevity Companies and non-Receivership Para Longevity Companies with promises of returns with annual interest rates that ranged from about 7.25% to 18%.

63.     Hundreds of the investors were unaccredited investors; many never filled out an accredited investor form, or only partially filled out an accredited investor form.

64.     As alleged by the OFR, by 2013, the Para Longevity Scheme had raised approximately $58,000,000 in funds primarily from individual investors, and by 2019 that number had risen to more than $300,000,000.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 18 of 84

65.     Despite assurances otherwise, the life settlement policies which purportedly secured the Notes were not owned or held by the respective Para Longevity Companies and non-Receivership Para Longevity Companies that solicited the investments.

66.     New investors' money was not used to purchase life insurance policies but was instead pilfered (a) to pay interest and redemptions to investors who had invested in other Para Longevity Companies and non-Receivership Para Longevity Companies, (b) to other companies, including the Centurion Companies, which used the money to purchase life settlement policies and retain ownership of the life settlement policies, or (c) to pay affiliated companies' expenses, including to NSI to pay its agents' commissions for assisting in the sale of Notes to investors.

67.     The Para Longevity Companies and non-Receivership Para Longevity Companies did not have sufficient sources of revenue to maintain the life insurance policies they purportedly purchased, let alone make interest payments or fund redemptions to investors – instead, the rogue insiders relied on proceeds from the sales of Notes to investors to perpetuate the Para Longevity Scheme.

68.     The perpetrators of the fraud also diverted money from their legitimate businesses (*i.e.*, NSI and SHPC) to fund the purchase of life settlement policies, pay premiums on life settlement policies, or to pay interest to investors in the Para Longevity Companies and non-Receivership Para Longevity Companies, to perpetuate the Ponzi scheme. Instead of paying investors in the Para Longevity Companies and non-Receivership Para Longevity Companies from the funds generated by the death benefits of the life insurance policies securing their investments, investors were routinely paid from the revenues generated by the legitimate business operations of other related companies such as NSI and SHPC and money raised from new investors.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 20 of 84

**B.    Seeman, Holtz, Schwartz, and Hodge**

69.    Seeman was the chief executive officer of the Seeman Holtz Companies, including the Para Longevity Companies and non-Receivership Para Longevity Companies, Centurion Companies, NSI, and SHPC. Along with Holtz, he created a vast enterprise of companies in the insurance industry.

70.    Holtz was the architect of NSI's financial advisory practice, and responsible for training and directing some of NSI's sale agents in the marketing, soliciting and sale of Notes to fuel the Para Longevity Scheme.

71.    Schwartz was responsible for creating the Centurion Companies and building financial relationships with banks, primarily Wells Fargo, and lenders to service the financial obligations and maintain the purported assets of the Para Longevity Companies and non-Receivership Para Longevity Companies.

72.    Hodge was the in-house counsel for the Receivership Entities.

73.    Hodge's primary role was to establish tax efficient structures and security intermediary relationships for the Centurion Companies and ensuring general legal compliance in the execution and performance of contracts of the Receivership Entities, including the Para Longevity Companies and for the non-Receivership Para Longevity Companies.

74.    Seeman once described Hodge as "the most conservative lawyer I've ever met."

75.    Hodge was informed by Seeman, Holtz, and Schwartz that all investors in the Para Longevity Companies and non-Receivership Para Longevity Companies were accredited investors, that they had all completed accredited investor forms, and that all PPM's were organized with specific numerical codes identifying the investors and the accreditation forms.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 21 of 84

76.     Hodge worked closely with Schwartz and believed that Schwartz was using his prudent business judgment in managing the financial affairs and obligations of the Centurion Companies.

77.     However, due to his conservative nature, Seeman and Holtz knew that if Hodge learned the true nature of the Para Longevity Scheme, Hodge would take the necessary steps to reverse the improper conduct, stop the Para Longevity Scheme, or alert the proper regulatory authorities.

78.     Seeman and Holtz concealed material information regarding the Para Longevity Scheme from Hodge, including, but not limited to, the magnitude of the funds raised through the Para Longevity Companies and non-Receivership Para Longevity Companies, the failure to properly confirm the accredited status of investors, the overleveraged status of the life settlement policies securing the investor Notes, and the fact that at various times throughout the life of the Para Longevity Companies and non-Receivership Para Longevity Companies, cash flow defects required the Para Longevity Companies and non-Receivership Para Longevity Companies to pay for the premiums of life settlement policies and the interest owed to investors using funds from SHPC and NSI, as well as debt financing through the Centurion Companies from third parties who took preferred security interests in the life settlement policies that were purportedly securing the Notes.

79.     These facts were concealed from Hodge, and, therefore, he was not aware that these facts were not disclosed to potential investors or that the Para Longevity Companies' and non-Receivership Para Longevity Companies' were being misused by the rogue operations of the Para Longevity Scheme.

80.    Seeman and Schwartz primarily managed the relationships with Wells Fargo, which served as Securities Intermediary for the insurance policies held by the Centurion Companies.  In his role as inhouse-counsel, Hodge negotiated contracts and assisted Seeman, Holtz, and Schwartz when asked.

81.    Unlike Wells Fargo, Hodge was not privy to the extensive investment fraud scheme to defraud investors, the pilfering of the Para Longevity Companies' and non-Receivership Para Longevity Companies' accounts, nor the extensive transfers of funds between the Para Longevity Companies and non-Receivership Para Longevity Companies, the Centurion Companies, and the other Receivership Entities by the perpetrators of the Para Longevity Scheme.

82.    Had Hodge known about the fraudulent mismanagement of the Para Longevity Companies' and non-Receivership Para Longevity Companies' assets, the pilfering of their accounts, and intentional fraud perpetrated by Seeman, Holtz, and Schwartz with Wells Fargo's substantial assistance, he would have stopped it.  Hodge had the authority and ability to take the necessary steps to stop the Para Longevity Scheme, protect the Para Longevity Companies' and non-Receivership Para Longevity Companies' assets, and/or alert the proper regulatory authorities.

**C.    The Fraud and Misrepresentations of the Para Longevity Scheme**

83.    By at least fiscal year-end ("FYE") December 31, 2015, the cash flow defects in the Para Longevity Scheme were apparent to Seeman, Holtz, and Schwartz.

84.    On June 7, 2016, the Centurion Companies' Certified Public Accountant issued a "going concern" opinion for Centurion Insurance Services Group, LLC ("CISG") focusing on growing liquidity demands and additional asset write-downs for FYE 2015, resulting in a net loss of $23.0 million in 2015.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 22 of 84

85.     As the need for cash continued to increase, Seeman, Holtz, and Schwartz continued to accelerate Notes sales.

86.     By 2015, the Centurion Companies increasingly relied on new investor funds received from the Para Longevity Companies and non-Receivership Para Longevity Companies to meet the prior issued Notes' obligations.

87.     The OFR alleged that the Centurion Companies identified cumulative total borrowings from the Para Longevity Companies and non-Receivership Para Longevity Companies growing to $135 million at FYE 2015; $157 million at FYE 2016; $193 million at FYE 2017; $250 million at FYE 2018; and $307 million at FYE 2019.

88.     While certain revenue was recognized by the Centurion Companies from the sales of life settlement policies in its portfolio, the revenue did not keep pace with the Para Longevity Companies' and non-Receivership Para Longevity Companies' cash needs to pay investor returns or life settlement policy premiums.

89.     The proceeds from the Para Longevity Companies' and non-Receivership Para Longevity Companies' Notes sales, diverted to the Centurion Companies, were without consideration to the Para Longevity Companies and non-Receivership Para Longevity Companies, lacked any written loan or repayment agreements, and were not repaid.   At base, the money was stolen and while some amounts were repaid, those payments were with funds from later investors' purchases of Notes from other Para Longevity Companies and non-Receivership Para Longevity Companies or from funds diverted from NSI or SHPC, perpetuating the Ponzi scheme.

90.     The OFR alleged that CISG's reported net worth was $69 million at FYE 2015; $76 million at FYE 2016; $43 million at FYE 2017 (which included a "pledge" of shares by SHPC Holdings I, LLC ("SHPC Holdings") to CISG, purportedly valued at $35 million, as an asset:

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 24 of 84

absent this pledge, CISG's net worth was $8 million); $128 million at FYE 2018 (also including the "pledge" of shares by SH Holdings to CISG, then purportedly valued at $198 million, as an asset: absent this pledge, CISG has a negative net worth of $70 million); and on information and belief, CISG had a negative net worth of $195 million at FYE 2019.

91.     During this period of low and negative net worth, Seeman, Holtz, and Schwartz had been using funds from new investors to pay old investors in the Para Longevity Companies and non-Receivership Para Longevity Companies.

92.     For example, on January 31, 2019, Para Longevity 2018-5, LLC deposited $100,000 from **Investor 1** into its Wells Fargo bank account ending ▮▮▮▮ On February 1, 2019, Para Longevity 2018-5, LLC transferred $100,000 from its Wells Fargo bank account ending x7018 to Para Longevity 2012-5, LLC's Wells Fargo bank account ending ▮▮▮▮ On February 11, 2019, Para Longevity 2012-5, LLC's Wells Fargo bank account cleared a check payable to **Investor 2** for $100,024.

93.     Other examples of later investors' funds being used to pay earlier investors interest or principal payments (in different Para Longevity Companies or non-Receivership Para Longevity Companies) include:

a.  On May 9, 2016, Para Longevity 2016-5, LLC deposited $50,000 from **Investor 3** into its Wells Fargo bank account ending ▮▮▮▮ On May 9, 2016, Para Longevity 2016-5, LLC transferred $50,000 from its Wells Fargo bank account ending ▮▮▮▮ to Para Longevity 2012, LLC's Wells Fargo bank account ending x1870.  On May 10, 2016, Para Longevity 2012, LLC Wells Fargo bank account cleared a check payable to **Investor 4** for $50,000.

24

b.  On July 28, 2015, Para Longevity 2015-3, LLC received $129,304.17 from **Investor 5** into its Wells Fargo bank account ending ▮▮▮▮  On July 28, 2015, Para Longevity 2015-3, LLC transferred $80,000 from its Wells Fargo bank account ending ▮▮▮▮ to Emerald Assets 2014, LLC's Wells Fargo bank account ending ▮▮▮▮  On July 28, 2015, Emerald Assets 2014, LLC issued a wire transfer from its Wells Fargo bank account ending x9151 to **Investor 6** for $94,315.26.

c.  On August 11, 2015, Para Longevity 2015-3, LLC received $137,646.25 from **Investor 7** into its Wells Fargo bank account ending x7405.  On August 11, 2015, Para Longevity 2015-3, LLC transferred $82,243 from its Wells Fargo bank account ending ▮▮▮▮ to Paraveda Investments V, Inc.'s Wells Fargo bank account ending x9409.  On August 11, 2015, Paraveda Investments V, Inc. issued a wire transfer from its Wells Fargo bank account ending ▮▮▮▮ to **Investor 8** for $72,843.67.

d.  On April 28, 2015, Para Longevity 2015-5 LLC received $400,000 from **Investor 9** into its Wells Fargo bank account ending x3160.  On April 28, 2015, Para Longevity 2015-5, LLC transferred $131,264 from its Wells Fargo bank account ending ▮▮▮▮ to Paraveda Investments V, Inc.'s Wells Fargo bank account ending ▮▮▮▮  On April 28, 2015, Paraveda Investments V, Inc. issued a wire transfer from its Wells Fargo bank account ending ▮▮▮▮ to **Investor 10** for $129,385.42.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 26 of 84

94.     The intended purpose of Para Longevity Companies and non-Receivership Para Longevity Companies was to purchase and pay the premiums of life settlement policies each was to acquire.

95.     The premiums on life settlement policies were supposed to be paid by investor funds.  However, without income from maturing policies, the Para Longevity Companies and non-Receivership Para Longevity Companies could not meet the growing liquidity demands of both investor interest payments, and premium payments.

**D.     The Centurion Companies and Wells Fargo as Securities Intermediary**

96.     In 2011, Seeman and Holtz formed CISG, to act as agent for Centurion ISG (Europe) Limited in facilitating the purchase, holding and servicing of a life settlement portfolio to be purchased with funds raised from investors.

97.     Schwartz served as the signatory on CISG's bank accounts and worked directly with Wells Fargo's personnel to establish and maintain a Securities Intermediary account at Wells Fargo to hold the life settlement policies.

98.     On February 12, 2014, Wells Fargo and CISG entered into a Securities Account Control Agreement that stated: "Centurion intends to acquire one or more in-force life insurance policies (each, a "Policy") from one or more Sellers (as defined herein) of Policies. Centurion desires to establish a securities account with the Securities Intermediary [Wells Fargo] and to engage Securities Intermediary to hold the policies for the benefit of Centurion in the securities account as directed by Centurion in accordance with the express terms hereof."

99.     On February 14, 2014, Wells Fargo and CISG entered into a Security Procedure Agreement where Wells Fargo agreed to accept any instructions from CISG concerning "All current and future life settlement related transaction to which [CISG] is a party."

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 27 of 84

100.     On August 22, 2014, Centurion Funding SPV I, LLC ("Centurion SPV I") entered into a debt financing arrangement with DZ Bank AG Deutsche Zentral-Gennossenschaftsbank ("DZ Bank") for up to $100,000,000 to fund the premiums on life settlement policies and to fund the purchases of annuities. These life settlement policies were held in a securities intermediary account at Wells Fargo.

101.     On August 21, 2014, Wells Fargo and DZ Bank entered into a Security Procedure Agreement where Wells Fargo agreed to accept any instruction from DZ Bank concerning a securities intermediary account titled "CenturionDZ."

102.     In December 2017, SPV I was in default on its obligations to DZ Bank, which was owed more than $17,000,000.00 at the time, and therefore foreclosed on the assets in the securities intermediary account ███████ (which included seven (7) life settlement policies and fifteen (15) annuities) for Centurion SPV I.

103.     Wells Fargo continued serving as Securities Intermediary to the Centurion Companies and as bank to the Centurion Companies, Para Longevity Companies, and Receivership Entities after the foreclosure by DZ Bank.

104.     On December 14, 2018, Centurion Funding SPV II, LLC ("Centurion SPV II") entered into a Credit Agreement ("Teleios Credit Agreement") with Teleios LS Holdings V DE, LLC and Teleios LS Holdings IV DE, LLC (together, "Teleios") for $22,500,000.00 to fund the premiums on the Centurion Companies' life settlement policies, of which there were only 61 as of September 2021.

105.     The Teleios and DZ Bank Credit Agreements and encumbrances upon the life insurance policies purportedly purchased by the Para Longevity Companies and non-Receivership Para Longevity Companies were never disclosed to investors.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 28 of 84

106.    The Teleios Credit Agreement states that Centurion SPV II, through Wells Fargo, had sole good and valid title to each of the policies pledged as collateral, free and clear of all liens. Wells Fargo knew this was false because it knew the Para Longevity Companies and non-Receivership Para Longevity Companies issued Notes to investors and raised hundreds of millions of dollars to fund the purchase of the life insurance policies and pay premiums on the policies in which Teleios took a preferred security interest.

107.    With Wells Fargo serving as Securities Intermediary, the Centurion Companies were able to hold the life settlement policies in a securities intermediary account, thereby making Wells Fargo the beneficiary of all the life settlement policies and enabling the Centurion Companies to sell the life settlement policies and transfer ownership to the buyer without notifying the insurance carrier by changing the name of the "entitlement holder" in Wells Fargo's books and records.

108.    Despite the fact that Wells Fargo was providing banking services for dozens of Para Longevity Companies and non-Receivership Para Longevity Companies, Wells Fargo knew, or should have known, that the hundreds of millions of dollars from investors received by the Para Longevity Companies and non-Receivership Para Longevity Companies which flowed through their respective Wells Fargo bank accounts were intended to purchase and maintain life insurance policies were the same policies in which Teleios obtained the first lien.  Yet, Wells Fargo represented and warranted in the Securities Account Control and Custodian Agreement that it did not have "actual knowledge of any other claim to, or interest in," any of the insurance policies over which it was Securities Intermediary.  That was false.

109.    The life insurance policies for which the investors in the Para Longevity Companies and non-Receivership Para Longevity Companies held Notes, and which the Para Longevity

28

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 29 of 84

Companies and non-Receivership Para Longevity Companies purchased or should have purchased, were pledged as collateral for Teleios' loan and held and maintained by Wells Fargo, while Wells Fargo facilitated the extensive Para Longevity Scheme and allowed the Para Longevity Companies' and non-Receivership Para Longevity Companies' rogue insiders to solicit investors for the same life insurance policies.

110.     This arrangement allowed the Centurion Companies to borrow against the value of the life settlement policies by granting lenders a right to instruct Wells Fargo to change the entitlement holder on the securities intermediary account upon the occurrence of a default on the loan.

111.     This also allowed the Para Longevity Scheme to create the appearance of profitability by overleveraging the assets that secured the illegal Notes and using the loans to pay the life settlement policy premiums, while new investor monies were continuously being raised from new Notes sales and used to pay interest and principal back to prior investors.

112.     In June 2022, Teleios foreclosed on the life settlement policies in the Wells Fargo securities intermediary account ████ for Centurion SPV II after the sale proceeds of the life settlement policies failed to reach a price in excess of the Teleios loan balance, accrued interest, and fees (the "Release Price") of $48,500,000.

113.     At all material times, Wells Fargo knew, or should have known, that the insurance policies for which investors were sold Notes to fund the purchases thereof through the Para Longevity Scheme, were encumbered by Teleios' first lien rights, that Centurion SPV II could not independently fund the policies or pay the premiums thereon, and that through the Para Longevity Scheme, investors and the Para Longevity Companies and non-Receivership Para Longevity Companies were being bilked.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 30 of 84

114.     Despite knowledge that its clients, the Para Longevity Companies and non-Receivership Para Longevity Companies, were to have owned and maintained the insurance policies, Wells Fargo knowingly and willfully allowed them to be pledged and encumbered by DZ Bank and Teleios.  When those life insurance policies were foreclosed upon, it was a near certainty that the Para Longevity Companies and non-Receivership Para Longevity Companies would be with nothing but liabilities to their investors, creditors, and victims.

115.     Wells Fargo was so deeply entrenched in the operations of the Receivership Entities as Trustee, Securities Intermediary, banker, and credit card issuer, that it had a unique combination of access and knowledge of the fraudulent activities.

116.     Yet, Wells Fargo substantially assisted the perpetrators of the Ponzi scheme, allowing them to pilfer of hundreds of millions of dollars from investors through Notes sales and through round-trip transactions among the Para Longevity Companies and non-Receivership Para Longevity Companies to further enable the Ponzi scheme.

**V.    WELLS FARGO'S IGNORANCE OF RED FLAGS AND FAILURE TO CONDUCT DUE DILIGENCE SUBSTANTIALLY ASSISTED THE SCHEME**

117.     At all times relevant hereto, dozens of the Receivership Entities opened and maintained bank accounts at Wells Fargo (collectively, the "Accounts") through which the fraudulent scheme was enabled.

118.     Wells Fargo opened the following Accounts for the Para Longevity Companies:

| | | Account App | | |
|---|---|---|---|---|
| **Entity Name** | **Bank Account #** | **Date** | **Industry** | **Description of Business** |
| Para Longevity 2014-5, LLC | ▬ | 11/07/13 | Real Estate, Rental and Leasing | [Left Blank] |
| Centurion ISG Services, LLC | ▬ | 06/27/14 | Finance and Insurance | Portfolio Servicing Management |
| Para Longevity 2015-3, LLC | ▬ | 02/11/15 | Finance and Insurance | Investment Finance |
| Para Longevity 2015-5, LLC | ▬ | 02/11/15 | Finance and Insurance | Investment Finance |
| Para Longevity 2016-3, LLC | ▬ | 01/07/16 | Finance and Insurance | Property Casualty |
| Para Longevity 2016-5, LLC | ▬ | 01/07/16 | Finance and Insurance | Property Casualty Insurance |
| Integrity Assets 2016, LLC | ▬ | 04/28/16 | Finance and Insurance | Casualty Insurance |
| Integrity Assets, LLC | ▬ | 04/28/16 | Finance and Insurance | Casualty Insurance |
| SH Global, LLC N/K/A Para Longevity V, LLC | ▬ | 04/28/16 | Finance and Insurance | Casualty Insurance |
| Emerald Assets 2018, LLC | x7000 | 06/22/17 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2018-3, LLC | x6994 | 06/22/17 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2018-5, LLC | x7018 | 06/22/17 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2019-5, LLC | x6271 | 10/25/18 | Finance and Insurance | Investment Finance |
| Para Longevity 2019-3, LLC | x8049 | 10/25/18 | Finance and Insurance | Investment Finance |
| Para Longevity VI, LLC | x0122 | 02/20/19 | Finance and Insurance | Property and Casualty |

119.   Wells Fargo also opened the following Accounts for the non-Receivership Para

Longevity Companies:

| | | Account App | | |
|---|---|---|---|---|
| **Entity Name** | **Bank Account #** | **Date** | **Industry** | **Description of Business** |
| Para Longevity Investments, LLC | ▬ | 08/12/11 | Real Estate, Rental and Leasing | [Left Blank] |
| Integrity Longevity Investments, LLC | ▬ | 08/22/11 | Real Estate, Rental and Leasing | [Left Blank] |
| Para Longevity 2012, LLC | ▬ | 07/11/12 | Real Estate, Rental and Leasing | [Left Blank] |
| Para Longevity 2012-5, LLC | ▬ | 08/07/12 | Real Estate, Rental and Leasing | r/e |
| Emerald Assets, LLC | ▬ | 03/18/13 | Finance and Insurance | [Left Blank] |
| Seeman Holtz Global, LLC | ▬ | 10/25/13 | Professional, Scientific, and Technical Svcs | [Left Blank] |
| Para Longevity 2014, LLC | ▬ | 11/07/13 | Real Estate, Rental and Leasing | [Left Blank] |
| Emerald Assets 2014, LLC | ▬ | 02/27/14 | Finance and Insurance | [Left Blank] |
| Paraveda Investments V, Inc | ▬ | 02/27/14 | Finance and Insurance | [Left Blank] |
| Emerald Assets 2015, LLC | ▬ | 04/03/15 | Finance and Insurance | Investment Advisors |
| Emerald Assets 2016, LLC | ▬ | 01/07/16 | Finance and Insurance | Property and Casualty Insurance |
| Alloy Element Assets, LLC | ▬ | 08/01/18 | Finance and Insurance | Casualty Insurance |
| Para Longevity 2019-7, LLC | ▬ | 10/25/18 | Finance and Insurance | Investment Finance |
| Emerald Assets 2019, LLC | ▬ | 10/25/18 | Finance and Insurance | Insurance |

120.   Wells Fargo bankers ignored their due diligence obligations and KYC regulations.

For example, Wells Fargo's typical account opening procedures were often not followed.  On

October 21, 2015, Maryin Vargas, Business Associate, Business Banking, Wells Fargo explained

to Seeman:

> Good afternoon Mr. Seeman,
>
> We will reach out to you before end of day to day. I am sure we can assist **but new procedures require us to get the new account applications signed in person** so we are looking into this.
>
> Thank you,

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 32 of 84

Sincerely,

Maryin Vargas

**Business Associate**

Business Banking | 200 S. Biscayne Blvd | Miami, Fl 33131  |
[*intentionally omitted, phone and email information*]

121.    Upon information and belief, Wells Fargo did not require Seeman to open the accounts in person and instead authorized the accounts to be opened by email.

122.    For example, on November 7, 2013, the account opening applications for early Para Longevity Companies and non-Receivership Para Longevity Companies at Wells Fargo, Para Longevity 2014, LLC (account ▆▆▆▆ and Para Longevity 2014-5, LLC (account ▆▆▆▆ were pre-filled with an incorrect industry description ("Real Estate, Rental and Leasing"), no business description, and were sent to Seeman only *after* the bank account had already been opened. On November 7, 2013, the Wells Fargo banker acknowledged the bank's violation by email: "Please note the accounts have been opened. However, I need the attached documents signed and return to my attention as soon as possible to avoid a compliance violation."   No further inquiry or investigation into the purposes for the accounts are evident from the account opening documentation produced by Wells Fargo.

123.    Instead of requiring Seeman or Holtz to complete their own account opening applications and certificates of beneficial ownership forms before opening bank accounts for the various Receivership Entities, Wells Fargo bankers would open the bank accounts, then pre-fill these forms and send them to Seeman and Holtz for execution.

124.    On February 9, 2015, Wells Fargo emailed Seeman Account Application and Authorization for Information forms that were entirely blank for Para Longevity 2015-3, LLC (account ▆▆▆▆ and for Para Longevity 2015-5, LLC (account ▆▆▆▆ Seeman signed the blank

32

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 33 of 84

forms and returned them to Wells Fargo on February 11, 2015.  The accounts were opened on February 11, 2015.  The account applications produced by Wells Fargo in response to a subpoena from the Receiver also show the Para Longevity 2015-3, LLC (account ███ and Para Longevity 2015-5, LLC (account ███ Account Application and Authorization for Information forms were, upon information and belief, completed by Wells Fargo not Seeman (as Seeman returned the executed blank forms to Wells Fargo) with a generic industry description ("Finance and Insurance"), and a limited, rote business description ("investment finance").

125.    Most of the accounts opened for the Para Longevity Companies and non-Receivership Para Longevity Companies at Wells Fargo were opened in a similar manner and had similar material discrepancies, including, but not limited to, incorrect business description of "Property Casualty," "Property Casualty Insurance," and "Casualty Insurance," and incorrect or incomplete beneficial ownership statements.

126.    However, Wells Fargo knew, or should have known, that the Para Longevity Companies and non-Receivership Para Longevity Companies were created to fund the purchase of life insurance policies and had nothing to do with real estate or property and casualty insurance.

127.    Wells Fargo's failure to follow basic due diligence practices and comply with the applicable KYC regulations created incorrect and incomplete client profiles which aided Seeman and Holtz in obfuscating the Para Longevity Scheme.

128.    Wells Fargo also maintained the following bank accounts for the Centurion Companies:

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 34 of 84

| Entity Name | Bank Account # | Account App Date |
|---|---|---|
| Centurion ISG Holdings II, LLC | x6248 | 08/27/18 |
| Centurion Funding SPV II LLC | x6230 | 08/27/18 |
| Centurion Funding SPV II LLC | x9800 | 12/14/18 |
| Centurion Funding SPV II LLC | x9801 | 12/14/18 |
| Centurion Funding SPV II LLC | x9802 | 12/14/18 |
| Centurion Funding SPV II LLC | x9803 | 12/14/18 |
| Centurion Funding SPV II LLC | x9804 | 12/14/18 |
| Centurion Funding SPV II LLC | x9805 | 12/14/18 |
| Centurion ISG (Europe) Limited | x8701 | 02/12/14 |
| Centurion ISG (Europe) Limited | x8700 | 02/12/14 |
| Centurion Funding SPV I LLC | x6203 | 08/22/14 |
| Centurion Funding SPV I LLC | x6202 | 08/22/14 |
| Centurion Funding SPV I LLC | x6201 | 08/22/14 |
| Centurion Funding SPV I LLC | x6200 | 08/22/14 |

129.    Wells Fargo knew that the Centurion Companies, as opposed to any of the Para Longevity Companies and non-Receivership Para Longevity Companies, actually owned the life settlement policies purchased using the funds raised by the Para Longevity Companies and non-Receivership Para Longevity Companies because Wells Fargo served as the Securities Intermediary for the life settlement policies.

130.    Wells Fargo also knew that Centurion SPV I and Centurion SPV II collectively borrowed almost $40,000,000 using the life settlement policies as collateral because Wells Fargo entered into Security Procedure Agreements with both DZ Bank and Teleios, which granted DZ Bank and Teleios certain rights to direct Wells Fargo regarding the distribution of assets held in the securities intermediary account.

131.    Yet, Wells Fargo did nothing to stop the Para Longevity Scheme from continuing to raise hundreds of millions of dollars from the sales of Notes while at the same time hypothecating the life insurance policies to lenders such as DZ Bank and Teleios.  Only Wells Fargo and the rogue operators of the Para Longevity Scheme were in the position to see both sides of the Ponzi scheme.

34

A.   **Wells Fargo Failed in its Duties to Know its Customers and the Nature of Their Business and Transactions.**

132.    Wells Fargo is obligated by law to "know its customers" – in this case the Receivership Entities – and maintain a customer due diligence program to understand the type of transactions, dollar volume and transaction volume each customer is likely to conduct, thereby providing the bank with a means of identifying unusual or suspicious transactions for each customer.

133.    Wells Fargo's abject failures enabled the intricate web of transfers which assisted Seeman, Holtz, and Schwartz in stealing money and misusing funds of the legitimate Receivership Entities, i.e., NSI, and by and among the Para Longevity Companies and non-Receivership Para Longevity Companies, to defraud them.

134.    Wells Fargo was obligated to identify its customers, report indications of suspicious activity, and assign a "customer risk rating."

135.    Reasonable due diligence also requires Wells Fargo to know what business their customer is in, its sources of revenue, and to understand the types of transactions a customer should, and actually does, make.

136.    When monitoring its customers' accounts, Wells Fargo is obligated to comply with the Bank Secrecy Act (BSA), including regulations broadening its anti-money laundering (AML) provisions.  The BSA requires Wells Fargo to develop, administer and maintain a program to ensure compliance. The program must be approved by the bank's board of directors and noted in the board meeting minutes. It must (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance and (4) provide training for appropriate personnel.

137.   Wells Fargo and its personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering indicia, or "red flags."

138.   Relevant here to the Receivership Entities' banking activities at Wells Fargo is the FFIEC BSA/AML Examination Manual,[6] which lists the following as "red flags" – most of which were repeatedly ignored by Wells Fargo:

- repetitive or unusual fund transfer activity;

  a.   Here, there were at least 5,100 transfers between the Plaintiff Para Longevity Companies and the same U.S. Bank account for one of the Centurion Companies, CISG.

- fund transfers sent or received from the same person to or from different accounts;

  b.   Here, there were at least 5,100 transfers between the Plaintiff Para Longevity Companies and the same U.S. Bank account for one of the Centurion Companies, CISG.

  c.   For example, on July 26, 2016, Para Longevity 2016-5, LLC deposited $110,000 from **Investor 11** into its Wells Fargo bank account ending ▮▮▮▮ On July 27, 2016 Para Longevity 2016-5, LLC transferred $100,000 from its Wells Fargo bank account ending ▮▮▮▮ to CISG's U.S. Bank account ending x3068.   On July 27, 2016, CISG transferred $100,000 from its U.S. Bank account ending x3068 to Integrity Longevity Investments, LLC's Wells Fargo bank account ending x0145.   On July 29, 2016, a check cleared Integrity

---

[6] The FFIEC BSA/AML Examination Manual referenced herein can be found at: https://bsaaml.ffiec.gov/manual/Appendices/07 (last accessed May 8, 2024).

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 36 of 84

Longevity Investments, LLC's Wells Fargo bank account ending ████ for $100,722.28 to **Investor 12**.

- transactions inconsistent with the account holder's business;

    d.  Here, transfers among the Para Longevity Companies and the non-Receivership Para Longevity Companies were not related to the limited description of the Para Longevity Companies Plaintiffs' businesses i.e., a "fund that buys life policies." None of the Para Longevity Companies or non-Receivership Para Longevity Companies actually directly purchased life policies.

    e.  Further, over $50,000,000 through over 400 transfers of funds from new Para Longevity Companies/non-Receivership Para Longevity Companies to old Para Longevity Companies/non-Receivership Para Longevity Companies and their investors also had no legitimate business purpose and were not related to the "account holder's business."

- transfers of funds among related accounts;

    f.  Here, more than $24,000,000 was transferred by and between the Plaintiffs' accounts at Wells Fargo. The Plaintiffs maintained fifteen (15) bank accounts at Wells Fargo through which at least $414,000,000 was moved through their accounts through deposits and withdrawals. And among the Para Longevity Companies, non-Receivership Para Longevity Companies, the Centurion Companies and their affiliates, more than $378,000,000 in intercompany transfers were processed between their Wells Fargo bank accounts during the operation of the Para Longevity Scheme.

- depositing of funds into several accounts that are later consolidated into a single master account;

 g.  Here, on multiple occasions cash was transferred into one of the Para Longevity Companies' or non-Receivership Para Longevity Companies' account and then out to CISG and other non-Para Longevity Companies nearly simultaneously.

 h.  As one example, on May 15, 2017, Para Longevity 2016-5, LLC received the following transfers into its Wells Fargo bank account ending x9370:

  i.  $280,000 from Para Longevity 2014, LLC's Wells Fargo bank account ending x8786,

  ii.  $200,000 from Para Longevity 2014, LLC's Wells Fargo bank account ending x8786,

  iii.  $55,000 from Para Longevity Investments, LLC's Wells Fargo bank account ending ████ and

  iv.  $30,000 from Para Longevity 2012-5, LLC's Wells Fargo bank account ending x8999.

 i.  Also on May 15, 2017, Para Longevity 2016-5, LLC made the following intercompany transfers from its Wells Fargo bank account ending ████:

  i.  $379,520.60 was transferred to CISG's U.S. bank account ending x3068 in five separate transactions.

  ii.  $36,500 was transferred to Para Longevity VI Holdings, LLC's Wells Fargo bank account ending x1912.

 j.  On May 16, 2017 Para Longevity 2016-5, LLC made the following intercompany transfers from its Wells Fargo bank account ending ████:

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 39 of 84

i.   $112,845.45 was transferred to CISG's U.S. Bank account ending x3068 in four separate transactions.

ii.   $20,000 was transferred to Para Longevity VI Holdings, LLC's Wells Fargo bank account ending x1912.

k.   The net effect of the intercompany transfers made within Para Longevity 2016-5, LLC's Wells Fargo bank account ending x9370 on May 15 and 16, 2017, was an increase in its ledger balance by $16,133.95 for no identified business purpose.

- large fund transfers sent in round dollar amounts;

l.   Here, round dollar transactions in the amounts of $50,000, $100,000, $200,000, etc., occurred with extensive frequency from the Plaintiffs' accounts.

- payments unconnected to legitimate contracts or revenue sources;

m.   Here, there were at least 5,100 transfers between the Plaintiffs and the same U.S. Bank account for one of the Centurion Companies, CISG, without consideration or other contractual or legitimate business purpose for the Plaintiffs.

n.   By way of further example, on June 26, 2018, Seeman emailed Beatriz Dezayas at Wells Fargo to initiate a wire transfer from Plaintiff Emerald Assets 2018, LLC's Wells Fargo account to CISG's account at U.S. Bank for $57,971.92 in reference to pay a policy premium for a life insurance policy in the name of Vittorio Gerardi. The *very same* life insurance policy was also pledged to Teleios and was controlled by Wells Fargo which served as Securities Intermediary.

- transacting businesses sharing the same address;

  o. Here, the Plaintiffs and other Para Longevity Companies and non-Receivership Para Longevity Companies and the Centurion Companies shared the same business address at 301 East Yamato Rd., Boca Raton, Florida.

- an unusually large number of persons or entities receiving fund transfers from one company;

  p. Here, there were at least 5,100 transfers between the Plaintiffs and the same U.S. Bank account for one of the Centurion Companies, CISG.

- loans secured by pledge assets held by third parties unrelated to the borrower;

  q. Here, the Notes sold to investors were supposed to be secured by the purchase of life settlement policies, which Wells Fargo knew were pledged to DZ Bank and Teleios by the Centurion Companies.

- loan secured by deposits or other readily marketable assets, such as securities, particularly when owned by apparently unrelated third parties;

  r. Here, the Notes sold to investors were supposed to be secured by the purchase of life settlement policies, which Wells Fargo knew were pledged to DZ Bank and Teleios by the Centurion Companies.  The Para Longevity Companies and non-Receivership Para Longevity Companies, which were supposed to have purchased the life settlement policies, were unrelated to the Centurion Companies.  For example, Para Longevity 2015-3, LLC was owned 50/50 by Valentino Global Holdings and Altrai Global, LLC, two single member LLCs that are owned by Seeman and Holtz, respectively.  Centurion Funding SPV I, LLC is a wholly owned subsidiary of JEMS LLC.  JEMS LLC is owned 50/50

40

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 40 of 84

by Centurion ISG Holdings LLC and Lotus Life Management, which is owned

by unrelated third parties.  When Paul Fritz, Assistant Vice President, Wells

Fargo Corporate Trust Services, Longevity Group, inquired on September 13,

2017:

> "The wholesale CCD standards require us to obtain, the ENTIRE
> ownership chain down to 25%. We needed to ensure that there is no other
> entity behind the two at 50% that indirectly have 25% or greater ownership
> of Centurion Funding SPV I LLC. For example, if they had someone that
> owns them at 100% then indirectly, that entity would have greater than
> 25% of our CIP customer, if that makes sense. In short, who owns
> Centurion ISG Holdings, LLC and Lotus Life Management, LLC, if they
> can confirm that there is no other entities that own greater than 25% then
> we are good to go."

In short, Wells Fargo knew of its obligations to know the ownership of the

Centurion Companies, in which the value of the life insurance policies was held,

were 50% owned by unrelated third parties, and ignored the red flags or failed

in its further investigation, if any.

- borrower defaults on a cash-secured loan or any loan that is secured by assets which are
  readily convertible into currency;

  s. Here, Wells Fargo as Securities Intermediary knew that in December 2017, DZ

  Bank had foreclosed on the assets in the securities intermediary account ▬▬▬

  for Centurion SPV I and yet, months later, agreed to serve as Securities

  Intermediary for Centurion SPV II, which assets were also later foreclosed on.

- loans are made for, or are paid on behalf of, a third party with no reasonable explanation;

  t. Here, examples of this red flag include payments by Para Longevity 2016-3,

  Para Longevity 2016-5, Para Longevity 2018-3, Para Longevity 2018-5, and

  SH Global n/k/a Para Longevity V, LLC, to Pelican Capital Management LLC

in aggregate total of $1,294,000 for debts owed by the Centurion Companies without any basis or reasonable purpose.

- payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number;

  u. Here, there were at least 120 transfers among the Para Longevity Companies and non-Receivership Para Longevity Companies with accounts at Wells Fargo annotated as "mistake" or "mistaken".

  v. Further, over $50,000,000 through over 400 transfers of funds from new Para Longevity Companies/non-Receivership Para Longevity Companies to old Para Longevity Companies/non-Receivership Para Longevity Companies and their investors also had no legitimate business purpose.

- suspicious movements of funds from one bank to another, then funds are moved back to the first bank.

  w. Here, there were at least 5,100 transfers between the Plaintiffs and the same U.S. Bank account for one of the Centurion Companies, CISG, without consideration or other contractual or legitimate business purpose for the Plaintiffs.  Through these round-trip transactions, prior investors in the Para Longevity Scheme were paid with money obtained by new investors in the Para Longevity Scheme, often within a day or a few days of the transfers into the later-formed Para Longevity Companies' and non-Receivership Para Longevity Companies' Wells Fargo accounts, with the funds then being transferred to the Centurion Companies' main account at U.S. Bank and then back to the earlier Para Longevity Companies' and non-Receivership Para Longevity Companies'

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 42 of 84

Wells Fargo accounts, and then paid to the earlier Note holder investor in classic Ponzi fashion.

x. For example, on June 21, 2016, SH Global LLC N/KA Para Longevity V, LLC received $474,868.50 from **Investor 13** in its Wells Fargo bank account ending x9894.  On June 22, 2016, SH Global LLC N/KA Para Longevity V, LLC wired $200,000 from its Wells Fargo bank account ending ███ to CISG's U.S. Bank account ending x3068.  On June 22, 2016, CISG wired $200,000 from its U.S. Bank account ending x9894 to Integrity Longevity Investments, LLC's Wells Fargo bank account ending x0145.  On June 22, 2016, Integrity Longevity Investments, LLC wired $211,283.33 from its Wells Fargo bank account ending x0145 to **Investor 14**.

139.   The FFIEC Manual also identifies "lending activities" and "nondeposit account services"— including nondeposit investment products — as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency.

140.   The FFIEC Manual requires heightened due diligence by Wells Fargo, including determining the purpose of the account, ascertaining the source and funds of wealth, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining explanations for account activity.

141.   To comply with FFIEC guidance and AML regulations, upon information and belief, Wells Fargo maintains systems to monitor accounts and account activity for improper activity.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 44 of 84

142. Upon information and belief, this system includes review, monitoring, and evaluation of transactions, the transacting parties, the parties' identity, and account patterns.

143. Wells Fargo is further expected to consult external sources, such as the internet, commercial databases, and direct inquiries to evaluate the nature of suspicious transactions and the identities of the parties to the transactions.

144. Upon information and belief, Wells Fargo collects and maintains information about its customers and their banking behavior to, among other things, detect and prevent money laundering and fraud and to protect itself from liability to third parties and reputational injury.

145. For this purpose, upon information and belief, Wells Fargo maintains procedures to determine the identity of each customer, 31 C.F.R. §§ 1020.220(a)(1), (2), and to collect information about the holder of each account, 31 C.F.R. § 1020.220(a)(2).

146. When an entity, rather than an individual opens an account, the bank obtains information about the individual who will control the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

147. Upon information and belief, the information that Wells Fargo collects about new business account clients includes the purpose and nature of the business, anticipated activity in the account (e.g., volume, value (number and dollar), and type of transaction), where the customer expects to transact business, and the products and services commonly used by the customer.

148. Based on this information, as well as external resources like internet search engines and public and commercial record databases, upon information and belief, Wells Fargo creates an initial client profile and assigns a compliance-related risk rating. Neither the profile, nor the risk rating, is or should be final or static.

149.   Upon information and belief, when Wells Fargo learns that customer information has materially changed, its internal controls require updating that information and, where appropriate, reassessing the customer's risk profile or rating.

150.   One of the ways in which a bank becomes aware of such changes is when the customer's transactions appear inconsistent with the bank's understanding of the nature and purpose of the account—for instance, when there are significant, unexplained changes in account activity.

151.   Upon information and belief, Wells Fargo also maintains internal controls to ensure ongoing compliance with federal AML laws and regulations.

152.   Upon information and belief, these include independent testing of the bank's compliance, regular monitoring of compliance, and training of personnel.

153.   Upon information and belief, the controls also include customer due diligence programs to prevent and detect money laundering.

154.   Upon information and belief, through these programs, Wells Fargo obtains information that gives it an understanding of the unique financial activity of its customers.

155.   Likewise, upon information and belief, Wells Fargo can predict the type and frequency of transactions in which its customers are likely to engage, including the dollar volume and transaction volume typical of each account.

156.   Upon information and belief, these datapoints are then used to identify unusual and suspicious transactions.

157.   From 2011 to 2017, federal agencies fined and imposed other disciplinary measures on Wells Fargo for its compliance failings, including its AML oversight.

45

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 46 of 84

158.    In 2013, in response to regulatory scrutiny, Wells Fargo reevaluated its systems. Upon information and belief, following an audit, the bank adopted a risk-management framework and made other substantive changes, including realigning over 5,000 employees.

159.    Upon information and belief, Wells Fargo also devoted substantial resources to developing and implementing surveillance technology, including artificial intelligence software, designed to enhance Wells Fargo's account-transaction monitoring system.

160.    Wells Fargo's deficient BSA and AML program also resulted in a Consent Order (the "2015 Consent Order") by the U.S. Office of the Comptroller of the Currency ("OCC") in In re Wells Fargo, No. AA-EC-201-79 (Nov. 19, 2015).

161.    The 2015 Consent Order was based on findings of "deficiencies in an internal control pillar of the Bank's program for Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance covering the Wholesale Banking Group line of business."

162.    The OCC found that Wells Fargo's BSA/AML customer risk assessment practices were ineffective, its customer due diligence practices were unsatisfactory, and its monitoring and oversight practices were inadequate.

163.    The 2015 Consent Order required, among other things, the establishment of a compliance committee, a comprehensive BSA/AML action plan, a comprehensive risk assessment of customer relationships, and development of appropriate customer due diligence and enhanced due diligence policies, procedures, and processes.

164.    By 2016, a Wells Fargo executive testified to Congress that the bank's policies, procedures, and internal controls were effective and compliant with AML laws.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 47 of 84

165.    And following termination of the 2015 Consent Order in January 2021 (and another consent order relating to improper retail sales practices), Wells Fargo issued statements addressing its AML-related procedures and infrastructure.

166.    Specifically, it confirmed that it "undertook significant work to remedy the deficiencies that gave rise to the consent order and to enhance its BSA/AML compliance program" and suggested that it had built "the right risk and control infrastructure."

167.    Thus, by the time many of the Para Longevity Companies and non-Receivership Para Longevity Companies opened bank accounts, and the Centurion Companies opened its security intermediary accounts, and used them to process and siphon hundreds of millions of dollars, and pledge the life insurance policies to both Notes holders and lenders such as DZ and Teleios, Wells Fargo's system of internal controls, including its company-wide compliance awareness protocols, risk management framework, and monitoring technology portfolio, provided Wells Fargo with the tools to readily detect the Para Longevity Scheme.

168.    Upon information and belief, in addition to its internal processes and software, Wells Fargo requires that its employees comply and be familiar with banking regulations and AML-related matters.

169.    Upon information and belief, Wells Fargo also provides AML training to all personnel whose duties may require such knowledge, including tellers and wire room personnel, to allow them to detect money laundering and fraud.

170.    Upon information and belief, supervising personnel then oversee the day-to-day issues and implementation of the Wells Fargo's compliance structure at its individual branches.

171.    Wells Fargo's alleged commitment to compliance is also reflected in its Code of Ethics and Business Conduct, which requires employees to "complete all customer due diligence

requirements[,] be alert to—and report—suspicious activity," and sets the policy of "completing all required . . . Compliance training on a timely basis."

172.     Upon information and belief, Wells Fargo bankers are trained to ask at least 20 fact-finding questions when opening new accounts.

173.     Upon information and belief, these questions include the use of the account and the customer's long-term intentions for the account.

174.     Upon information and belief, new accounts that are less than 60 days old are also subject to greater scrutiny and limitations, including mandatory review by additional personnel.

175.     Similarly, upon information and belief, a banker processing an outgoing wire transfer is trained to ask the customer questions designed to detect possible money laundering, including the purpose of the transaction, and the nature of the relationship between the parties.

176.     Upon information and belief, wire transfers between $25,000 and $100,000 automatically prompt personnel to use a checklist to evaluate the transaction.

177.     Upon information and belief, a manager who approves outgoing wires often conducts a secondary review to confirm that the checklist questions were adequately addressed.

178.     Upon information and belief, wire transfers above $100,000 require additional approval of a regional Wells Fargo employee, and transactions over $500,000 also require branch manager authorization.

179.     Upon information and belief, a similar process is employed for checks.

180.     Upon information and belief, before the bank credits a large check, multiple bankers review the check image for potential indicators of fraud or other misconduct, including unusual notations and disparities between the location of the payor, payee, and depositor.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 49 of 84

181.  Upon information and belief, when these efforts detect unusual activity, employees examine the account more fully, including by reviewing the account's transaction history and consulting with employees who opened or service the account.

182.  Upon information and belief, many branch-level employees also regularly review Balance Fluctuation Reports.

183.  Upon information and belief, these reports highlight substantial balance fluctuations and list the account activity in certain accounts.

184.  Upon information and belief, Wells Fargo employees must also complete Currency Transaction Reports on any cash transactions exceeding $10,000.

185.  Upon information and belief, to complement these human efforts, Wells Fargo uses its advanced transaction monitoring software portfolio, which includes Actimize, an artificial intelligence and data analytics software platform.

186.  Upon information and belief, Actimize markets its product as "entity-centric" and capable of revealing hidden connections and relationships between transacting parties across multiple accounts and transactions.

187.  Upon information and belief, Actimize automatically reviews transactions against customers' backgrounds and transaction histories, compares account activity against AML and other compliance red flags, and automatically detects and analyzes abnormal or risky behavior.

188.  Upon information and belief, when the software identifies activity warranting further review or escalation, it alerts bank personnel.

189.  Despite all of the procedures, protocols, "red flag" compliance rules, and regulatory requirements, all of which would have detected and prevent the perpetuation of the Para Longevity Scheme, Wells Fargo's abject failures to detect and stop the scheme are undeniable.

49

190.    Indeed, as Securities Intermediary, Wells Fargo knew the Centurion Companies' business practices were "not normal".

191.    On September 24, 2018, Paul Fritz, Assistant Vice President, Wells Fargo Corporate Trust Services, Longevity Group, emailed the Centurion Companies that their repeated failure to pay policy premiums led to Wells Fargo receiving "consistent grace notices" "causing a strain at times to keep up with so many policies week to week. **This is not normal for accounts we administer** as most times policies are kept out of grace and grace notices are not frequent occurrences. Can you provide me with the expectations on your side in keeping policies in active status. Is the expectation that you will pay the minimal amount and pay grace amounts very near the end of the grace period? **That appears to be the history for this account**."

192.    Rather than investigate the clear and ongoing red flags and determine how the Centurion Companies could fund the policy premiums when Wells Fargo knew it was not receiving income from death benefits from the life insurance policies, Wells Fargo simply stated: "I would like to confirm though if this is going to be continued procedure on your side or not." Wells Fargo continued to serve as Securities Intermediary despite these known red flags.

**B.    Wells Fargo's Many Roles Enabled the Ponzi Scheme**

193.    Wells Fargo provided a full service to substantially assist the Para Longevity Scheme, acting as the Trustee of the ILITS that owned certain life settlement policies, as Securities Intermediary for Centurion Companies acting as beneficiary of the policies, and as the primary bank for the operating and checking accounts of the dozens of Receivership Entities, including the Centurion Companies, Para Longevity Companies, non-Receivership Para Longevity Companies, and their affiliates.

50

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 51 of 84

194.    Wells Fargo knew, or should have known, of the Para Longevity Scheme that has now been revealed as a Ponzi scheme.

195.    Wells Fargo's actions and inactions were integral to the Para Longevity Scheme to defraud investors and pilfer the accounts of the Para Longevity Companies and non-Receivership Para Longevity Companies and the assets of NSI.

196.    At the heart of this scheme were the life settlement policies; the assets that held the scheme together for as long as it did by purporting to serve as security for the Notes sold to investors.

197.    Wells Fargo's relationship with Seeman, Holtz, Schwartz, and the Receivership Entities extended almost 15 years.

198.    Between December 2007 and August 2012, Wells Fargo served as the Trustee of several ILITS that owned certain life settlement policies funded by the Centurion Companies. Notably, Wells Fargo's resignation as Trustee was negotiated in June 2013 but dated August 2012 and was effectuated after Wells Fargo began asking questions about Schwartz's attempts to sell the policies over which Wells Fargo was Trustee.

199.    Wells Fargo had an early understanding of how Seeman, Holtz, and Schwartz funded the purchases of life insurance policies which evolved into its role as Securities Intermediary in later transactions.

200.    Between August 2011 and 2021, Wells Fargo opened and served as the primary bank for 58 bank accounts of the Centurion Companies, Para Longevity Companies, and non-Receivership Para Longevity Companies and their affiliates.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 52 of 84

201.     Wells Fargo had a long-term business relationship with Seeman and Holtz and the companies they operated.  And it is apparent that Wells Fargo also relaxed its KYC policies when dealing with them.

202.     Wells Fargo relationship managers pre-filled account application forms on Seeman's behalf and forwarded them to Seeman for his execution, instead of making Seeman prepare the forms himself and explain the purpose of the account, the nature of the business of the company opening the account, the expected transactions, and the sources of revenue.

203.     Seeman repeatedly and routinely provided inconsistent answers regarding the beneficial owners of the Para Longevity Companies.

204.     Seeman provided incomplete and cryptic answers regarding the nature of the Para Longevity Companies' businesses.

205.     Seeman never provided answers regarding the sources of revenues of the Para Longevity Companies.

206.     For example, in response to an email from a Wells Fargo business associate on October 1, 2015, requesting Seeman to explain the nature of business and business description for a long list of Receivership Entities. On October 10, 2015, Seeman responded with only half sentence responses:

The answers are below
Best Regards
Marshal Seeman

**From:** blanca.dunmyer@wellsfargo.com [mailto:blanca.dunmyer@wellsfargo.com]
**Sent:** Thursday, October 01, 2015 10:57 AM
**To:** Marshal Seeman
**Subject:** Accounts

Good morning Marshal,

52

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 53 of 84

Per our phone conversation of earlier in the week, please indicate the nature of business and business description for each entity below:

**EMERALD ASSETS, LLC –** Fund that buys life insurance policy
**EMERALD ASSETS HOLDINGS, LLC –** holding company for fund for Emerald Asserts companies

**EMERALD ASSET 2014, LLC –** fund that buys life policies

**EMERALD ASSET 2015, LLC –** fund that buys life policies

**SEEMAN HOLTZ GLOBAL, LLC –** fund that buy life insurance policies

**SEEMAN-HOLTZ CONSULTING CORP –** management company for life agency
**Seeman Holtz Property and Casualty-** Property and casualty insurance agency

**CENTURION AVIATION CAPITAL INC –** This account can be closed no activity--------------------------------please close this account

**CENTURION ISG SERVICES, LLC –** services payment son life insurance polcies

**PARAVEDA INVESTMENTS V, LLC –** fund that buys life polcies

**PARA LONGEVITY 2014, LLC –** fund that buys life polcieis

**PARA LONGEVITY 2014-5, LLC –** fund that buys life polices

**PARA LONGEVITY 2015-3, LLC –** fund that buys life polcies

**PARA LONGEVITY 2015-5, LLC –** fund that buys life polcieis and pays premiums on them

**PARA LONGEVITY 2012-5, LLC –** fund that buys life policies

**PARA LONGEVITY 2012, LLC –** fund that buys life polciies

**PARA LONGEVITY INVESTMENTS, LLC** fund that buys life polciies

**PARA LONGEVITY HOLDINGS VI LLC –** Holding company for para companies

**INTEGRITY LONGEVITY INVESTMENTS, LLC –** fund that buys life policeis

**24K CAPITAL INC –** Makes loans to people on their life policies

**NATIONAL SENIOR INSURANCE –** Life and health insurance agency

Best regards,

Blanca C. Dunmyer

Officer
Business Associate

Wells Fargo Business Banking | 200 S. Biscayne Blvd | Miami, FL 33131
[*intentionally omitted, phone and email information*]

53

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 54 of 84

207.     Wells Fargo should have identified these grossly inadequate disclosures as a red flag, for both the Para Longevity Companies, non-Receivership Para Longevity Companies, and the Centurion Companies.  Wells Fargo, through its role as Securities Intermediary, knew that the Centurion Companies were the companies which were represented as the owners of the life settlement policies.

208.     Wells Fargo also knew, or should have known, that the money raised through the Para Longevity Companies and non-Receivership Para Longevity Companies (i.e., each a "fund") was not used to "buy(s) life polices."  Wells Fargo had the unique vantage point to see the vast number of transactions to/from the Para Longevity Companies' and non-Receivership Para Longevity Companies' accounts, transfers to the Centurion Companies, and the legion of other misuses of the Para Longevity Companies' and non-Receivership Para Longevity Companies' bank accounts – despite the five-word KYC disclosure from Seeman about the nature of the Para Longevity Companies' businesses, with each a "fund that buys life policies."

209.     For example, on the banking side of Wells Fargo, on June 28, 2017, Wells Fargo's Michael Salamone, Senior Relationship Manager, Vice President, Palm Beach Business Banking wrote a comprehensive email to Seeman seeking, first information about Para Longevity 2015-5, LLC (an entity formed two years *prior* to the June 28, 2017 request for information):

> Dear Mr. Seeman,
>
> We are requesting your help to gather important information about your business.
>
> To comply with recent changes in government regulations, Wells Fargo must verify **the first name, middle initial, last name, date of birth, residential address, and country of residence for each beneficial owners of**
>
> A *beneficial owner* is:
>
> o  Each person who, directly or indirectly, owns 25% or more of the equity interests of the legal entity customer (e.g., whether shares of stock in a corporation or membership interests in a limited liability company). A beneficial owner is the person to whom the funds or assets in the account ultimately belong; AND

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 55 of 84

o One person with significant responsibility to control, manage or direct the legal entity customer, including an executive officer or senior manager (e.g., a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer) or any other individual who regularly performs similar functions.

**Please provide the requested information in the table below for each beneficial owner of Copy and paste to add additional rows to the table below and provide the requested information if there are multiple beneficial owners.**

Please provide the requested information in the table below for each beneficial owner of **PARA LONGEVITY 2015-5, LLC.** If no individual meets this definition, please write "Not Applicable."

| First Name | Middle Initial | Last Name | Date of Birth | Residential Full Address | Residential Country |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Please provide the requested information in the table below for an individual with significant responsibility for managing If appropriate, an individual listed above may also be listed in this section. If "Not Applicable" was stated above, an individual must be provided below.

| First Name | Middle Initial | Last Name | Date of Birth | Residential Full Address | Residential Country |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Copy and paste to add additional rows to the table, if needed.

**Please provide the required information by replying via secure email** to ensure that your information is sent to us safely. For instructions on how to do this, refer to the *Reply to a Secure Email* link on our website at https://www.wellsfargo.com/help/secure-email. Should you have any concerns, you may contact your Relationship Manager and use 1167855.

The following is background on why we need this information:

- Wells Fargo continues to enhance our customer due diligence process. These enhancements allow us to better manage risk and to comply with existing and new regulations related to preventing money laundering, the financing of terrorism and other financial crimes.

- Some of the enhancements in our due diligence standards are the result of a new regulation from the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN).

- In May 2016, FinCEN issued a rule strengthening the due diligence that financial institutions must perform on customers. This new rule requires that financial institutions thoroughly understand the

business of their customers and their intended purpose in opening accounts. Additionally, financial institutions must obtain and verify information about the beneficial owners of legal entity customers.

- This additional beneficial ownership information we collect ensures that we can identify and verify your management structure and that we know exactly who we should engage with at your company, which will help reduce the risk of potential fraud.

We appreciate your business. We want to ensure that you have the support you need to partner with us in completing this request. I am here to help if needed. You may reach me at 704-548-6768, Monday-Friday, 8am-5pm EST.

Thank you,

**Michael Salamone**

Senior Relationship Manager, Vice President
Palm Beach Business Banking
980 N Federal Highway Boca Raton, FL 33432
[*intentionally omitted, phone and email information*]

210.    The same June 28, 2017, email also requested the same information for more than twenty other companies, including Para Longevity Companies and non-Receivership Para Longevity Companies which had maintained accounts at Wells Fargo for several years prior to the request:

Marshal,

These are all the entities that we need to verify. Please send me separate emails with break down of entities for any LLC grouping. For example I know Signal Point Capital is different then most so fill out separate email for this. See form at bottom of email to be completed. Call me with any questions. Thank you,

SIGNAL POINT CAPITAL, LLC
SEEMAN HOLTZ PRIVATE CLIENT
SH GLOBAL, LLC
SEEMAN-HOLTZ CONSULTING CORP.
SEEMAN HOLTZ PROPERTY AND CASUALTY,
EMERALD ASSETS, LLC
PARA LONGEVITY 2016-5, LLC
PARA LONGEVITY 2015-5, LLC
PARA LONGEVITY 2014-5, LLC
INTEGRITY ASSETS 2016, LLC
PARA LONGEVITY 2015-3, LLC
EMERALD ASSETS 2016, LLC
EMERALD ASSET 2015, LLC
INTEGRITY ASSETS, LLC
SEEMAN HOLTZ WEALTH MANAGEMENT, INC.
PARA LONGEVITY 2016-3, LLC
PARA LONGEVITY HOLDINGS VI LLC
Baxter Touby, Llp
PARA LONGEVITY INVESTMENTS, LLC
INTEGRITY LONGEVITY INVESTMENTS, LLC
PARA LONGEVITY 2014, LLC

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 56 of 84

56

**Michael Salamone**
Senior Relationship Manager, Vice President
Palm Beach Business Banking
980 N Federal Highway Boca Raton, FL 33432
[*intentionally omitted, phone and email information*]

211.     Despite facially acknowledging its legal obligations, Wells Fargo either knew that the Para Longevity Companies and non-Para Longevity Companies were not buying life insurance policies, as was their intended business, or willfully ignored their duty to "thoroughly understand the business of their customers and their intended purpose in opening accounts."

212.     Wells Fargo knew that the Para Longevity Companies and non-Receivership Para Longevity Companies and the Centurion Companies had no legitimate contracts, invoices, or other exchange of goods or services to justify the transfers between them.

213.     It knew this because of its relationship as the bank for the above-listed Para Longevity Companies' and non-Receivership Para Longevity Companies, as well as its companion role as Securities Intermediary for the Centurion Companies.

**C.     Wells Fargo's Had the Knowledge and Duty to Stop the Para Longevity Scheme**

214.     Wells Fargo, with its unique vantage point as a bank, knew that the Para Longevity Companies and non-Receivership Para Longevity Companies owed their investors monthly and quarterly interest checks on the Notes sold, and that the Para Longevity Companies and non-Receivership Para Longevity Companies did not have either the assets or liquidity to pay the periodic interest checks because (1) the Para longevity Companies and non-Receivership Para Longevity Companies owned *zero* assets, and (2) Wells Fargo routinely issued overdraft and insufficient funds email notification to the Para Longevity Companies and non-Receivership Para Longevity Companies.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 57 of 84

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 58 of 84

215.    Through its own KYC policies, Wells Fargo knew, or should have known, that the Para Longevity Companies and non-Receivership Para Longevity Companies were created to fund the purchase of and pay the premiums on life settlement policies.

216.    Wells Fargo knew that the Para Longevity Companies and non-Receivership Para Longevity Companies did not in fact purchase or own any life settlement policies, did not have a security interest in any life settlement policies, and did not have an interest in the death benefits in the life settlement policies because Wells Fargo acted as the Securities Intermediary for the life settlement policies and managed the books that determined the entitlement holders of those policies' payouts.

217.    Wells Fargo knew that the life settlement policies it held as a Securities Intermediary were overleveraged and could not serve as a security to pay back the hundreds of millions of dollars of Notes obligations incurred by the Para Longevity Companies and non-Receivership Para Longevity Companies.

218.    Due to its KYC policies and its intimate relationship with the Para Longevity Companies, non-Receivership Para Longevity Companies, and the Centurion Companies, Wells Fargo knew that these life settlement related transactions were the same policies purportedly securing the Notes sold by the Para Longevity Companies and non-Receivership Para Longevity Companies.

219.    Wells Fargo provided substantial services and assistance to the Para Longevity Companies, and non-Receivership Para Longevity Companies, and the Centurion Companies that made the Para Longevity Scheme possible.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 59 of 84

220.     Had Wells Fargo paid attention to the persistent red flags, complied with its duties, or conducted any meaningful due diligence, the Ponzi scheme would not have grown to catastrophic levels.

## CAUSES OF ACTION

The delayed discovery doctrine, the continuing violations doctrine and equitable tolling apply to all causes of action herein.

### COUNT I:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

221.     The allegations contained in paragraphs 1 through 220 above, are repeated as if fully set forth herein.

222.     Seeman and Holtz owed a fiduciary duty to the Receivership Entities. Seeman and Holtz owed a duty of loyalty, care, and utmost good faith and fair dealings to the Plaintiffs. Seeman and Holtz were required to exercise their reasonable and product business judgment in the best interest of the Plaintiffs.

223.     Seeman and Holtz breached their fiduciary duties to the Plaintiffs by, *inter alia*:

a.   using the Para Longevity Companies and non-Receivership Para Longevity Companies to sell unregistered securities to largely unaccredited investors;

b.   using the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies for transactions other than their expressed and intended purposes, i.e., to purchase life settlement policies;

c.   misappropriating the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies and transferring them without consideration to SHPC and the Centurion Companies;

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 60 of 84

    d.   transferring the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies to the Centurion Companies who purchased life settlement policies without granting the Para Longevity Companies and non-Receivership Para Longevity Companies any interest in or entitlement to the death benefits;

    e.   using new funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies to pay old investors in the Para Longevity Companies and non-Receivership Para Longevity Companies creating a Ponzi scheme, and subjecting the Para Longevity Companies and non-Receivership Para Longevity Companies to civil and criminal liability;

    f.   allowing the life settlement policies that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on life settlement policies;

    g.   overleveraging of the life settlement policies to create an appearance of profitability from the value of life settlement policies, which did not exist;

    h.   granting third parties a preferred secured position on the life settlement policies that were purportedly securing the Notes sold to investors in the Para Longevity Companies and non-Receivership Para Longevity Companies; and

    i.   facilitating the use of NSI's assets to fund the Para Longevity Scheme.

224.   Instead of using the Para Longevity Companies' and non-Receivership Para Longevity Companies' funds for their intended investment purpose, Seeman and Holtz ran a Ponzi scheme with those funds further damaging the Plaintiffs.

225.    Wells Fargo knew that Seeman and Holtz were breaching their fiduciary duties to the Para Longevity Companies and non-Receivership Para Longevity Companies and of its role in promoting those breaches.

226.    Wells Fargo was the primary bank for all the Plaintiffs. Wells Fargo knew that the Plaintiffs transferred large sums of money by and between their accounts without any legitimate business purpose.

227.    Wells Fargo knew, or should have known, that the Para Longevity Companies and non-Receivership Para Longevity Companies were created for the purpose of raising funds to purchase life settlement policies, however, the funds were improperly transferred to the Centurion Companies who purchased the life policies without granting the Para Longevity Companies or non-Receivership Para Longevity Companies any interest in the death benefits of those policies. In turn, the Centurion Companies borrowed against the life settlement policies, and Wells Fargo, acting as the Securities Intermediary, agreed to grant the lenders an interest in the death benefits in the event of a default, which default occurred and caused the foreclosure upon the life settlement policies.

228.    Through its active monitoring of the Plaintiffs' accounts and its role as a security intermediary over the primary assets of the Para Longevity Scheme, Wells Fargo knew that the assets were not being used for their intended purpose, that the assets were overleveraged, and that the assets could not possibly secure the millions of dollars in Notes sold to innocent investors by the Para Longevity Companies and non-Receivership Para Longevity Companies.

229.    Wells Fargo nonetheless knowingly and substantially assisted Seeman and Holtz in breaching their fiduciary duties to NSI, the Para Longevity Companies and non-Receivership Para Longevity Companies, by:

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 62 of 84

a. facilitating the transfers of funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies for transactions other than their expressed and intended purposes, i.e., to purchase life settlement policies;

b. facilitating the misappropriation of funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies and transferring them without consideration from the Centurion Companies and prior investors in other Para Longevity Companies and non-Receivership Para Longevity Companies;

c. transferring the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies to the Centurion Companies which purchased life settlement policies without granting the Para Longevity Companies and non-Receivership Para Longevity Companies any interest in or entitlement to the death benefits;

d. facilitating the transfers of new funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies to pay old investors in the Para Longevity Companies and non-Receivership Para Longevity Companies, creating a Ponzi scheme, and subjecting the Para Longevity Companies and non-Receivership Para Longevity Companies to civil and criminal liability and allowing the rogue insiders to abscond with their assets;

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 63 of 84

e.  allowing the life settlement policies that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on life settlement policies;

f.  overleveraging of the life settlement policies to create an appearance of profitability from the value of life settlement policies, which did not exist;

g.  knowingly allowing third parties to take a preferred secured position on the life settlement policies that were purportedly securing the Notes sold to investors in the Para Longevity Companies and non-Receivership Para Longevity Companies;

h.  allowing the Centurion Companies' accounts and assets to be used in a manner that bore no reasonable resemblance to how such securities intermediary accounts are properly used;

i.  facilitating, accommodating, and not impeding or stopping Seeman's and Holtz's movement of funds and assets, as described above, despite knowing the duties owed by them and the nature of the assets and funds they were handling;

j.  not informing Alan Hodge or any other person at the Receivership Entities of the severity of the risks created by the actions of Seeman and Holtz, such that these losses could have been prevented or avoided; and

k.  facilitating the use of NSI's assets to fund the Para Longevity Scheme.

230.  Wells Fargo substantially benefited from assisting Seeman and Holtz. Wells Fargo, through its banking relationship with Seeman and Holtz, earned income from fees and from its possession of deposits.

231.   As a direct and proximate cause of Seeman and Holtz's breaches and Wells Fargo's assistance thereof, the Plaintiffs suffered damages in an amount to be determined at trial.

WHEREFORE, the Receiver demands judgment in his favor and against Wells Fargo for (a) actual compensatory, consequential and incidental damages in an amount to be proven at trial; (b) such civil penalties as allowed by law; (c) pre- and post-judgment interest as allowed by law; and (d) such other and further relief as the Court may deem just and proper. for such other relief as the Court deems just and proper.

## COUNT II AIDING AND ABETTING FRAUD

232.   The allegations contained in paragraphs 1 through 219 above, are repeated as if fully set forth herein.

233.   Seeman and Holtz defrauded the Para Longevity Companies and non-Receivership Para Longevity Companies as follows:

a.  using the Para Longevity Companies and non-Receivership Para Longevity Companies to sell unregistered securities to largely unaccredited investors;

b.  using the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies for transactions other than their expressed and intended purposes, i.e., to purchase life settlement policies;

c.  misappropriating the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies and transferring them without consideration to the Centurion Companies and prior investors in other Para Longevity Companies and non-Receivership Para Longevity Companies;

d.  transferring the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies to the Centurion Companies who

purchased life settlement policies without granting the Para Longevity Companies and non-Receivership Para Longevity Companies any interest in or entitlement to the death benefits;

e.  using new funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies were used to pay old investors in the Para Longevity Companies and non-Receivership Para Longevity Companies, creating a Ponzi scheme, and subjecting the Para Longevity Companies and non-Receivership Para Longevity Companies to civil and criminal liability and absconding with their assets;

f.  allowing the life settlement policies that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on life settlement policies;

g.  overleveraging of the life settlement policies to create an appearance of profitability from the value of life settlement policies, which did not exist;

h.  granting third parties a preferred secured position on the life settlement policies that were purportedly securing the Notes sold to investors in the Para Longevity Companies and non-Receivership Para Longevity Companies; and

i.  using NSI's assets to fund the Para Longevity Scheme.

234.   Instead of using the Para Longevity Companies' and non-Receivership Para Longevity Companies' funds for their intended investment purpose, Seeman and Holtz ran a Ponzi scheme with those funds. Such use of the Para Longevity Companies' and non-Receivership Para Longevity Companies' funds directly harmed the Plaintiffs.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 66 of 84

235.    Wells Fargo knew, or should have known, that Seeman and Holtz were breaching their fiduciary duties to the Plaintiffs and of its role in promoting those breaches.

236.    Wells Fargo was the primary bank for the Plaintiffs. Wells Fargo knew that the Plaintiffs transferred large sums of money by and between their accounts without any legitimate business purpose.

237.    Wells Fargo knew, or should have known, that the Para Longevity Companies and non-Receivership Para Longevity Companies were created for the purpose of raising funds to purchase life settlement policies, however, the funds were improperly transferred to the Centurion Companies who purchased the life policies without granting the Para Longevity Companies and non-Receivership Para Longevity Companies any interest in the death benefits of those policies. In turn, Centurion Companies borrowed against the life settlement policies, and Wells Fargo, acting as the Securities Intermediary, agreed to grant the lenders an interest in the death benefits in the event of a default, which default occurred and caused the foreclosure upon the life settlement policies.

238.    Through its active monitoring of the Plaintiffs' bank accounts and its role as a Security Intermediary over the primary assets of the Para Longevity Scheme, Wells Fargo knew, or should have known, that the assets were not being used for their intended purpose, that the assets were overleveraged, and that the assets could not possibly secure the millions of dollars in Notes sold to innocent investors by the Para Longevity Companies and non-Receivership Para Longevity Companies.

239.    Wells Fargo nonetheless knowingly and substantially assisted the fraud committed and Ponzi scheme perpetrated by:

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 67 of 84

a.  facilitating the transfers of funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies for transactions other than their expressed and intended purposes, i.e., to purchase life settlement policies;

b.  facilitating the misappropriation of funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies and transferring them without consideration from the Centurion Companies and prior investors in other Para Longevity Companies and non-Receivership Para Longevity Companies;

c.  transferring the funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies to the Centurion Companies which purchased life settlement policies without granting the Para Longevity Companies and non-Receivership Para Longevity Companies any interest in or entitlement to the death benefits;

d.  facilitating the transfers of new funds solicited through the Para Longevity Companies and non-Receivership Para Longevity Companies to pay old investors in the Para Longevity Companies and non-Receivership Para Longevity Companies, creating a Ponzi scheme, and subjecting the Para Longevity Companies and non-Receivership Para Longevity Companies to civil and criminal liability and allowing the rogue insiders to abscond with their assets;

e.  allowing the life settlement policies that purportedly secured the Notes to become overleveraged by borrowing money from third parties to purchase and pay the premiums on life settlement policies;

f.  overleveraging of the life settlement policies to create an appearance of profitability from the value of life settlement policies, which did not exist;

g.  knowingly allowing third parties to take a preferred secured position on the life settlement policies that were purportedly securing the Notes sold to investors in the Para Longevity Companies and non-Receivership Para Longevity Companies;

h.  allowing the Centurion Companies' accounts and assets to be used in a manner that bore no reasonable resemblance to how such securities intermediary accounts are properly used;

i.  facilitating, accommodating, and not impeding or stopping Seeman's and Holtz's movement of funds and assets, as described above, despite knowing the duties owed by them and the nature of the assets and funds they were handling;

j.  not informing Alan Hodge or any other person at the Receivership Entities of the severity of the risks created by the actions of Seeman and Holtz, such that these losses could have been prevented or avoided;

k.  facilitating the use of NSI's assets to fund the Para Longevity Scheme.

240.  Wells Fargo substantially benefited from assisting Seeman and Holtz in their scheme. Wells Fargo, through its banking relationship with Seeman and Holtz earned income from fees and from its possession of deposits.

68

241.    Instead of being used for investment purposed or otherwise held for the benefit of the Para Longevity Companies and non-Receivership Para Longevity Companies, the Plaintiffs' funds were misappropriated, and the life settlement policies securing their Notes were overleveraged and lost to third-party creditors.

242.    The Plaintiffs lost their money and their assets *and* now face significant liability from investors who are be due return of their principal.

243.    As a direct and proximate cause of the massive fraud and Wells Fargo's assistance thereof, the Plaintiffs have suffered damages in an amount to be determined at trial.

WHEREFORE, the Receiver demands judgment in his favor and against Wells Fargo for (a) actual compensatory, consequential and incidental damages in an amount to be proven at trial; (b) such civil penalties as allowed by law; (c) pre- and post-judgment interest as allowed by law; and (d) such other and further relief as the Court may deem just and proper. for such other relief as the Court deems just and proper.

## COUNT III:
## NEGLIGENCE

244.    The allegations contained in paragraphs 1 through 220 above, are repeated as if fully set forth herein.

245.    The Plaintiffs maintained fifteen (15) bank accounts at Wells Fargo through which at least $414,000,000 was moved through their accounts through deposits and withdrawals.  And among the Para Longevity Companies, non-Receivership Para Longevity Companies, the Centurion Companies and their affiliates, more than $378,000,000 in transfers between their respective Wells Fargo bank accounts were processed during the operation of the Para Longevity Scheme.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 70 of 84

246. Wells Fargo owed the Plaintiffs the duty of ordinary and reasonable care applicable to banks and financial institutions because of the opening, operation, maintenance and management of the accounts.

247. Instead of using the Para Longevity Companies' and non-Receivership Para Longevity Companies' funds for their intended investment purpose, Seeman and Holtz ran a Ponzi scheme with those funds.

248. Wells Fargo breached its duty of care to the Para Longevity Companies and non-Receivership Para Longevity Companies by:

    a. failing to know its customer through account opening documents and due diligence;

    b. failing to implement adequate account monitoring programs and guidelines;

    c. allowing, facilitating, and executing the commingling of monies across the Para Longevity Companies' and non-Receivership Para Longevity Companies' accounts;

    d. failing to inform any of the investors, Hodge, or other control persons of Seeman and Holtz's misconduct;

    e. failing to report Seeman's and Holtz's misconduct to law enforcement and/or regulatory agencies;

    f. failing to freeze or close the Para Longevity Companies' and non-Receivership Para Longevity Companies' accounts upon discovering Seeman and Holtz's misconduct;

g. allowing and facilitating Seeman and Holtz's theft from the Para Longevity Companies' and non-Receivership Para Longevity Companies' bank accounts; and

h. aiding and abetting Seeman and Holtz's breaches of fiduciary duty and conversion of assets.

249. As a direct and proximate result of Wells Fargo's negligence, as set forth herein, the Plaintiffs have suffered damages for which Wells Fargo is liable.

WHEREFORE, the Receiver demands judgment in his favor and against Wells Fargo for (a) actual compensatory, consequential and incidental damages in an amount to be proven at trial; (b) such civil penalties as allowed by law; (c) pre- and post-judgment interest as allowed by law; and (d) such other and further relief as the Court may deem just and proper. for such other relief as the Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

250. The allegations contained in paragraphs 1 through 220 above, are repeated as if fully set forth herein.

251. Wells Fargo provided banking services to the Plaintiffs through various bank accounts. Those bank accounts were used to carry out the Ponzi scheme.

252. The funds held in the Plaintiffs' bank accounts conferred benefits upon Wells Fargo in the form of deposits from which Wells Fargo generated income, including but not limited to interest, transfer fees, service fees, transaction fees and online banking fees. Wells Fargo knowingly and voluntarily accepted, and retained, the deposits and those benefits.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 71 of 84

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 72 of 84

253.    Because Wells Fargo aided and abetted the fraud and breach of fiduciary duty by Seeman, Holtz, and Schwartz, it would be inequitable for Wells Fargo to retain the benefits it generated from Plaintiffs' bank accounts.

254.    As a result, Wells Fargo must disgorge its gains from its conduct.

WHEREFORE, the Receiver demands judgment in his favor and against Wells Fargo for the return of income and fees retained by Wells Fargo from the funds held in the Plaintiffs' bank accounts; pre- and post-judgment interest; and/or such other and further relief as the Court deems just and proper.

Dated: May 9, 2024                                Respectfully submitted,

                                                  BERGER SINGERMAN LLP
                                                  *Counsel for Receiver*
                                                  201 East Las Olas Blvd., Suite 1500
                                                  Fort Lauderdale, FL 33301
                                                  Tel. (954) 525-9900
                                                  Fax (954) 523-2872

                                                  By:  */s/ Gavin C. Gaukroger*
                                                        Gavin C. Gaukroger
                                                        Florida Bar No. 76489
                                                        ggaukroger@bergersingerman.com
                                                        Brian G. Rich
                                                        Florida Bar No. 38229
                                                        brich@bergersingerman.com
                                                        Michael J. Niles
                                                        Florida Bar No. 107203
                                                        mniles@bergersingerman.com
                                                        William O. Diab
                                                        Florida Bar No. 1010215
                                                        wdiab@bergersingerman.com

13002602-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 73 of 84

# <u>EXHIBIT A</u>

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 74 of 84

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION**

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION,

      Plaintiff,

v.                        CASE NO.: 50-2021-CA-008718-XXXX-MB

NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
MARSHAL SEEMAN,
CENTURION INSURANCE SERVICES GROUP, LLC,
BRIAN J. SCHWARTZ,
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTERGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY 2019-6, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,
ALTRAI GLOBAL, LLC A/K/A ALTRAI HOLDINGS, LLC,
VALENTINO GLOBAL HOLDINGS, LLC,
AMERITONIAN ENTERPRISES, LLC,
SEEMAN-HOLTZ CONSULTING CORP.,
CENTURION ISG Holdings, LLC,
CENTURION ISG Holdings II, LLC,
CENTURION ISG (Europe) Limited,
CENTURION ISG SERVICES, LLC,
CENTURION ISG FINANCE GROUP, LLC,
CENTURION FUNDING SPV I LLC,
CENTURION FUNDING SPV II LLC,
GRACE HOLDINGS FINANCIAL, LLC,
PRIME SHORT TERM CREDIT INC.,

      Defendants.

12416620-1

THE ESTATE OF ERIC CHARLES HOLTZ,
SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC
F/K/A SEEMAN HOLTZ PROPERTY AND CASUALTY, INC.,
SHPC HOLDINGS I, LLC,

     Relief Defendants.

_____/

## ORDER ESTABLISHING PROCEDURES GOVERNING RECOVERY ACTIONS TO BE COMMENCED BY THE RECEIVER

**THIS CASE** having come before the Court on September 5, 2023 at 8:45 a.m., upon the *Receiver's Motion for Orders Establishing Procedures and Scheduling Order Governing Recovery Actions to be Commenced by the Receiver* (the "**Procedures Motion**"), filed by Daniel J. Stermer (the "**Receiver**"), by and through counsel, and pursuant to Fla. Civ. P. § 1.200 and §1.700, seeking the entry of procedures governing recovery actions to be filed by the Receiver; and this Court having jurisdiction to consider and determine the Procedures Motion and determining that the Procedures Motion is necessary and in the best interests of the Receivership Estates; and good cause existing;

     **It is ORDERED**:

     1.    The Procedures Motion is **GRANTED** as set forth in this Order.

     2.    The procedures that govern all Actions filed by the Receiver (the "**Actions**") are as follows.

     A.    **Effectiveness of Order**

     3.    This Order shall apply to all parties in the Actions.

     4.    This Order shall not alter, affect, impair or modify the rights of any such defendants, except as provided in this Order.

     B.    **Judge Assignment.** Upon the filing of an Action, the Receiver shall file with the complaint a copy of the Procedures Order establishing the Procedures in this Case. The clerk of

2

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 75 of 84

court shall direct all matters subject to the Procedures Order to be assigned to Judge Bradley Harper, Circuit Court Judge. Pursuant to the Order Appointing Receiver:

    i.    The Clerk of the Court shall docket a Supplemental Proceeding under this matter's case number, and a separate Supplemental Proceeding number, and shall assign such supplemental proceeding to this Court's division.

    ii.    All pleadings and other papers filed in a Supplemental Proceeding shall contain a separate sub-caption and the Supplemental Proceeding number in addition to the caption and the case number applicable to the main case.

    **C.**    **Mandatory Mediation**

    5.    The parties to each of the Actions shall conduct and complete mandatory mediation within 90 days after each complaint is filed (the "**Mediation Deadline**"), provided, however, that the Receiver may, in his sole discretion, extend the Mediation Deadline without further Order of the Court for an additional thirty (30) days (so that extended mediations must be completed within one hundred and twenty (120) days after the filing of a complaint).

    6.    Within thirty (30) days of entry of this Order, the Receiver shall identify a mediator that will serve as the default mediator for all of the Actions (the "**Mediator**"). If the Mediator has a scheduling conflict or if the Mediator has a conflict with respect to a particular defendant, then the Receiver shall, in his sole discretion, select another mediator to mediate such Proceeding. In the event a party objects to the Mediator or any other mediator selected by the Receiver, and are unable to come to an agreement on an alternate mediator, the parties shall notify the Court, which will ultimately decide the mediator for that particular Proceeding.

    7.    On or before the Mediation Deadline, the Receiver, working with the mediator, will schedule mediations in Florida (or via Zoom or other electronic method). The defendants shall cooperate with the Receiver and the mediator regarding the scheduling of mediations. The Receiver's counsel shall contact the defendants with a list of proposed dates for mediation. Mediation will then be scheduled on a first-come, first-served basis.

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 76 of 84

12416620-1

3

8.     The mediator may request the parties submit position statements, any relevant papers and exhibits, and a settlement proposal in advance of the scheduled mediation.

9.     The fees of the mediator shall be split equally by the parties, and payment arrangements satisfactory to the mediator must be completed prior to the commencement of the mediation.

10.     The mediator will preside over the mediation with full authority to determine the nature and order of the parties' presentations. The mediator may implement additional procedures that are reasonable and practical under the circumstances.

11.     The length of time necessary to effectively complete the mediation will be within the mediator's discretion. The mediator may also adjourn a mediation that has been commenced if the mediator determines that an adjournment is in the best interest of the parties, provided that the mediation is concluded by the Mediation Deadline.

12.     The parties shall participate in the mediation, as scheduled and presided over by the mediator, in good faith and with a view toward reaching a consensual resolution. An authorized representative of the plaintiff and defendant with full settlement authority shall attend the mediation in person; provided, however, that the mediator, in her or his sole discretion, may allow such representative to appear telephonically, although the party's legal counsel is required to attend in person.

13.     If a party (a) fails to submit the submissions required by the mediator, (b) fails to timely pay any bill for the mediator's fees, or (c) fails to attend the mediation as required, then the non-defaulting party may file a motion for default judgment or a motion to dismiss the Proceeding, and in the case of a defendant's failure to pay the mediator's fees, the Receiver may withhold disbursement on account of any allowed claim filed the defendant.

14.     In addition, if the mediator feels that a party to the mediation is not attempting to

12416620-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 77 of 84

schedule or resolve the mediation in good faith, the mediator may file a report with the Court. The Court may, without need for further motion by any party, schedule a hearing. If the Court determines that the party is not cooperating in good faith with the mediation procedures, the Court may consider the imposition of sanctions including, but not limited to, entry of a default judgment or dismissal of the Proceeding. Additionally, if either party to the mediation is not attempting to schedule or resolve the mediation in good faith, then the opposite party may file a motion for sanctions with the Court including, but not limited to, entry of a default judgment or dismissal of the Proceeding. Litigation with respect to the issuance of sanctions shall not delay the commencement of mediation.

15.    Within five (5) business days after the conclusion of the mediation, the mediator will file a report (the "**Mediator's Report**"), drafted with the caption of the Proceeding, which need only state (i) the date that the mediation took place, (ii) the names of the parties and counsel that appeared at the mediation, and (iii) whether the Proceeding settled or the mediator declared an impasse (the "**Impasse Notice**").

16.    The mediator shall not be called as a witness by any party except as set forth in this paragraph. No party shall attempt to compel the testimony of, or compel the production of documents from, the mediators or the agents, partners, or employees of the mediator's law firm(s). Neither the mediators nor their respective agents, partners, law firms, or employees (i) are necessary parties in any proceeding relating to the mediation or the subject matter of the mediation, nor (b) shall be liable to any party for any act or omission in connection with any mediation conducted under this Order. Any documents provided to the mediator(s) by the parties shall be destroyed 30 days after the filing of the Mediator's Report, unless the Mediator is otherwise ordered by the Court. However, subject to court order, a mediator may be called as a witness by any party and may be compelled to testify on a limited basis in proceedings where it is alleged that

12416620-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 78 of 84

a party failed to comply with the mediation procedures set forth in this Order.

17.   All proceedings and writings incident to the mediation shall be privileged and confidential, and shall not be reported or placed into evidence.

### D.   Compromises

18.   Compromises and settlements reached in the Actions shall be brought before the Court for approval.

### E.   Extension of Deadline to Answer or Otherwise Respond to Complaint

19.   The deadline for a defendant to file an answer or otherwise respond to the complaint shall be extended to the first business day that is the earlier of: (i) thirty (30) days from the date that the mediator files an Impasse Notice, or (ii) one hundred and twenty (120) days from the date that the summons is issued (the "**Response Deadline**").

### F.   Formal Discovery Stayed Until After Mediation

20.   Formal discovery in the Actions are stayed until the Response Deadline. On or after the Response Deadline, the parties may proceed with formal discovery, except for depositions of key witnesses who the Receiver believes have information relevant to more than one Proceeding ("**Key Witnesses**"). The Receiver will file a list of Key Witnesses within thirty (30) days of an order approving this Motion. The list of Key Witnesses can be modified from time to time by the Receiver, at his sole discretion, by filing an amended list with the Court. Any party that wishes to take the deposition of a Key Witness must attend the scheduled deposition of such Key Witness. The Receiver shall be responsible for coordinating the depositions of Key Witnesses. The parties shall use reasonable efforts to coordinate among themselves the order of inquirer and scope of inquiries of Key Witnesses so that the questioning is not repetitive or redundant. The discovery cutoff deadline shall be 30 days from the date the Court sets the Proceeding for trial. Except for the foregoing, the Florida Rules of Civil Procedure will remain in full force and effect with respect

to depositions.

### G. Pretrial Conferences Eliminated in Favor of Omnibus Hearings

21.     The Court will not conduct individual pretrial conferences in each separate Action. Instead, the Receiver will schedule separate omnibus hearings. Initially, the omnibus hearings will be scheduled on a quarterly basis at the Court's convenience. If it becomes necessary or advisable, the Receiver may request that omnibus hearings be scheduled on a monthly basis or bi-monthly basis. All motions and other matters concerning the Actions will only be heard at the omnibus hearings.

## TRIAL AND PRETRIAL OBLIGATIONS

### H. Notice for Trial

22.     After each of the Actions are at issue and ready to be set for trial, the Receiver shall file a notice of readiness for trial, identifying the Actions that are at issue and ready to be set for trial and identifying the common issues that may be tried together.

### I. Final Omnibus Hearing; Setting Trial

23.     The Court will then set a final omnibus hearing (the "**Final Omnibus Hearing**"), at which time the Court will set the Actions for each round for trial and may enter a trial order with additional obligations for the parties, including with respect to exhibits and sworn declarations. All such deadlines required under the Florida Rules of Civil Procedure will be scheduled after the Final Omnibus Hearing pursuant to an order.

### J. Special Settings

24.     If the attorney(s) trying an Action are from outside this district, or the parties or witnesses are from outside this district, or if some other reason that justifies a request to the court to specially set trial at a time or date certain, counsel shall request appropriate relief at the Final

12416620-1

Omnibus Hearing.

**K.**   **Miscellaneous**

25.    To the extent of a conflict between the Court's local rules and this Order, this Order shall control.

26.    The deadlines and/or provisions contained in this Order may be extended and/or modified by the Court upon written motion and for good cause shown or by consent or the parties pursuant to stipulation, which needs to be filed with the Court but does not require a Court order.

**L.**   **Notice of Right to Object to this Order**

27.    The Receiver shall serve a copy of the applicable Procedures Order with the complaint and initial summons in each Action.

28.    Each defendant shall have 14 days from date a complaint and summons is served to file and serve on the Receiver an objection to the Procedures Order, which shall state which specific provision of the Procedures Order defendant objects to and why.

29.    The Court reserves the ability to modify the terms of the Procedures Order as necessary.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida.

.

502021CA008718XXXXMB   09/05/2023
Bradley G. Harper   Circuit Judge

502021CA008718XXXXMB   09/05/2023
Bradley G. Harper
Circuit Judge

BRADLEY HARPER
CIRCUIT COURT JUDGE

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 82 of 84

Copies to:

A. Gregory Melchior, Esq. and George Bedell, Esq.
Office of General Counsel
Florida Office of Financial Regulation
200 East Gaines Street
Tallahassee, Florida 32309
greg.melchior@flofr.gov
george.bedell@flofr.gov
*Attorneys for Plaintiff*

Scott A. Orth, Esq.
Law Offices of Scott Alan Orth
3860 Sheridan Street, Ste. A
Hollywood, FL 33021
scott@orthlawoffice.com
service@orthlawoffice.com
eserviceSAO@gmail.com
*Attorney for Defendant Marshal Seeman and Twenty-six Defendant Entities*

Daniel J. Stermer, Esq.
Development Specialists, Inc.
500 W. Cypress Creek Road, Suite 400
Fort Lauderdale, Florida 33309
dstermer@DSIConsulting.com
*Receiver*

Brian G. Rich, Esq. and Gavin C. Gaukroger, Esq.
Berger Singerman LLP
525 Okeechobee Boulevard, Suite 1250
West Palm Beach, FL 33401
brich@bergersingerman.com
ggaukroger@bergersingerman.com
*Attorneys for Receiver, Daniel J. Stermer*

Gary A. Woodfield, Esq.
*Nason Yeager Gerson Harris & Fumero, P.A.*
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
gwoodfield@nasonyeager.com

12416620-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 83 of 84

sdaversa@nasonyeager.com
*Counsel for The Estate of Eric Charles Holtz*


Victoria R. Morris, Esq.
Andrew C. Lourie, Esq.
Kobre & Kim LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
Andrew.Lourie@kobrekim.com
Victoria.Morris@kobrekim.com
*Attorneys for Relief Defendant Seeman Holtz Property and Casualty LLC*

David L. Luikart III, Esq.
Hill, Ward & Henderson, P.A.
101 East Kennedy Boulevard, Suite 3700
Tampa, FL 33602
Dave.luikart@hwhlaw.com
Michelle.armstrong@hwhlaw.com
*Attorneys for Prime Short Term Credit, Inc.*

Joshua W. Dobin, Esq.
James C. Moon, Esq.
Meland Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
jdobin@melandbudwick.com
jmoon@melandbudwick.com
mramos@melandbudwick.com
*Attorneys for Teleios LS Holdings V DE, LLC and Teleios LS Holdings IV DE, LLC*

Bernard Charles Carollo, Jr., Esq.
John J. Truitt, Esq.
William Leve, Esq.
Vernon Litigation Group
8985 Fontana Del Sol Way
Naples, FL 34109
bcarollo@vernonlitigation.com
jtruitt@vernonlitigation.com
wleve@vernonlitigation.com
nzumaeta@vernonlitigation.com
*Attorneys for Edwin and Karen Ezrine, Intervenors and Tom Echolds, Interested Party*

12416620-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGE-JCAFIE-H Page 84 of 84

Gary M. Murphree, Esq.
Brandy Abreu, Esq.
AM Law, LC
10743 SW 104th Street
Miami, FL 33186
gmm@amlaw-miami.com
babreu@amlaw-miami.com
mramirez@amlaw-miami.com
pleadings@amlaw-miami.com
*Attorneys for Zoe Seijas and Victor Seijas, Jr., Trustees of Victor Seijas Living Trust*

Harris J. Koroglu, Esq.
Shutts & Bowen LLP
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
hkoroglu@shutts.com
*Attorneys for MCM 301 Yamato LLC*

11

12416620-1



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

### DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 6/6/2024 12:42:12 PM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CBDCAJHGD-JCAFID-B |
| **Case Number:** | 502024CA004345XXXAMB |
| **Case Docket:** | CIVIL COVER SHEET |
| **Requesting Party Code:** | 517 |

### CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

### HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

\*\*The web address shown above contains an embedded link to the verification page for this particular document.



Case 9:24-cv-80722-DPG Document 1-2 Entered on FLSD Docket 06/07/2024 Page 90 of 128

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

*Unique Code : CAA-FBH-BCAJJ-CBDCAJHGD-JCAFID-B Page 1 of 3*

     **I.        CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE <u>FIFTEENTH</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>PALM BEACH</u>  COUNTY, FLORIDA

<u>Daniel J Stermer</u>
Plaintiff

                                                       Case # _____
                                                       Judge  _____

vs.

<u>Wells Fargo Bank N A</u>
Defendant

     **II.        AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐  $8,000 or less
☐  $8,001 - $30,000
☐  $30,001- $50,000
☐  $50,001- $75,000
☐  $75,001 - $100,000
☒  over $100,000.00

     **III.        TYPE OF CASE**        (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 05/09/2024 04:36:39 PM

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT
THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER,
PALM BEACH COUNTY.

VISIT https://appsgp.mypalmbeachclerk.com/Services/EcertifyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT



Digitally signed by The Honorable Joseph Abruzzo
Date: 2024.06.06 12:43:06 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGD-JCAFID-B Page 2 of 3

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐ Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☒ Other
    ☐ Antitrust/Trade regulation
    ☒ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.   REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.   NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)
   4

**VI.   IS THIS CASE A CLASS ACTION LAWSUIT?**
   ☐ yes
   ☒ no

**VII.   HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
   ☐ no
   ☒ yes If "yes," list all related cases by name, case number, and court.
   Case No. 50-2021-CA-008718-XXXX-MB

**VIII.   IS JURY TRIAL DEMANDED IN COMPLAINT?**
   ☐ yes
   ☒ no

**IX.   DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
   ☐ yes
   ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Gavin C. Gaukroger     Fla. Bar # 76489
   Attorney or party         (Bar # if attorney)

Gavin C. Gaukroger       05/09/2024
(type or print name)      Date

- 3 -

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGD-JCAFID-B Page 3 of 3



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 6/6/2024 12:47:17 PM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CBDDCDFFF-JCAFIJ-J |
| **Case Number:** | 502024CA004345XXXAMB |
| **Case Docket:** | NOTICE NOTICE OF ACCEPTANCE OF SERVICE OF PROCESS |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

**The web address shown above contains an embedded link to the verification page for this particular document.



**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION**

CASE NO. 50-2024-CA-004345-XXXA-MB

DANIEL J. STERMER, as Receiver for
NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
CENTURION ISG SERVICES, LLC
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-r3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,

       Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

       Defendant.

_____/

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION,

     Plaintiff,

v.                       CASE NO.: 50-2021-CA-008718-XXXX-MB

NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
MARSHAL SEEMAN,
CENTURION INSURANCE SERVICES GROUP, LLC,
BRIAN J. SCHWARTZ,
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,

*Unique Code : CAA-FBH-BCAJJ-CBDDCDFFF-JCAFIJ-J Page 1 of 3*

\*\*\* FILED: PALM BEACH COUNTY, FL  JOSEPH ABRUZZO, CLERK. 05/15/2024 12:12:46 PM \*\*\*

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT
THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER,
PALM BEACH COUNTY.
VISIT https://appsgp.mypalmbeachclerk.com/Services/EcertifyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT



Digitally signed by The Honorable Joseph Abruzzo
Date: 2024.06.06 12:48:12 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

Unique Code : CAA-FBH-BCAJJ-CBDDCDFFF-JCAFIJ-J Page 2 of 3

PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY 2019-6, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,
ALTRAI GLOBAL, LLC A/K/A ALTRAI HOLDINGS, LLC,
VALENTINO GLOBAL HOLDINGS, LLC,
AMERITONIAN ENTERPRISES, LLC,
SEEMAN-HOLTZ CONSULTING CORP.,
CENTURION ISG Holdings, LLC,
CENTURION ISG Holdings II, LLC,
CENTURION ISG (Europe) Limited,
CENTURION ISG SERVICES, LLC,
CENTURION ISG FINANCE GROUP, LLC,
CENTURION FUNDING SPV I LLC,
CENTURION FUNDING SPV II LLC,
GRACE HOLDINGS FINANCIAL, LLC,
PRIME SHORT TERM CREDIT INC.,

     Defendants.

THE ESTATE OF ERIC CHARLES HOLTZ,
SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC
F/K/A SEEMAN HOLTZ PROPERTY AND CASUALTY, INC.,
SHPC HOLDINGS I, LLC,

     Relief Defendants.
_____/

## NOTICE OF ACCEPTANCE OF SERVICE OF PROCESS

Plaintiff Daniel J. Stermer, as Receiver, by and through undersigned counsel, hereby gives notice that Defendant Wells Fargo Bank, N.A. ("Defendant") by and through its counsel, acknowledged receipt of the *Summons* and *Complaint* in the above-referenced matter, and accepted service of process by email on May 14, 2024. Notice is further given that Defendant shall respond to the *Complaint* in accordance with the provisions of the *Order Establishing Procedures Governing Recovery Actions to Be Commenced by the* Receiver, attached to the *Complaint* as Exhibit A.

2

Unique Code : CAA-FBH-BCAJJ-CBDDCDFFF-JCAFIJ-J Page 3 of 3

Dated:  May 15, 2024

Respectfully submitted,

BERGER SINGERMAN LLP
*Counsel for Receiver*
201 East Las Olas Blvd., Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 525-9900
Fax (954) 523-2872

By:  /s/ *Gavin C. Gaukroger*
       Gavin C. Gaukroger
       Florida Bar No. 76489
       ggaukroger@bergersingerman.com
       Brian G. Rich
       Florida Bar No. 38229
       brich@bergersingerman.com
       Michael J. Niles
       Florida Bar No. 107203
       mniles@bergersingerman.com
       William O. Diab
       Florida Bar No. 1010215
       wdiab@bergersingerman.com

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on May 15, 2024, a true and correct copy of the foregoing

document was filed electronically through the Florida Court's E-Filing Portal and will be served by

e-mail to counsel for Wells Fargo Bank, N.A., listed below.

By:  /s/ *Gavin C. Gaukroger*
       Gavin C. Gaukroger

Jarrod D. Shaw, Esq.
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue
Suite 1800
Pittsburgh, PA 15222-3142
jshaw@mcguirewoods.com

13012179-1

3



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 6/6/2024 12:44:10 PM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B |
| **Case Number:** | 502024CA004345XXXAMB |
| **Case Docket:** | NOTICE OF RELATED CASE AND FILING OF ORDER ESTABLISHING PROCEDURES GOVERNING RECOVERY ACTIONS TO... |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

**The web address shown above contains an embedded link to the verification page for this particular document.



**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT**
**IN AND FOR PALM BEACH COUNTY, FLORIDA**
**CIVIL DIVISION**

DANIEL J. STERMER, as Receiver for    CASE NO. _____
NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
CENTURION ISG SERVICES, LLC
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,

    Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

    Defendant.

_____/

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION,

    Plaintiff,

v.           CASE NO.: 50-2021-CA-008718-XXXX-MB

NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
MARSHAL SEEMAN,
CENTURION INSURANCE SERVICES GROUP, LLC,
BRIAN J. SCHWARTZ,
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 1 of 15

12998640-1

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT
THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER,
PALM BEACH COUNTY, FLORIDA. THIS DOCUMENT DOES NOT REFLECT SUBSEQUENT ACTIVITY.
VISIT https://appsgp.mypalmbeachclerk.com/Services/EcertifyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 05/09/2024 04:36:39 PM

Digitally signed by The Honorable Joseph Abruzzo
Date: 2024.06.06 12:45:04 -04:00
Clerk Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 2 of 15

PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY 2019-6, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,
ALTRAI GLOBAL, LLC A/K/A ALTRAI HOLDINGS, LLC,
VALENTINO GLOBAL HOLDINGS, LLC,
AMERITONIAN ENTERPRISES, LLC,
SEEMAN-HOLTZ CONSULTING CORP.,
CENTURION ISG Holdings, LLC,
CENTURION ISG Holdings II, LLC,
CENTURION ISG (Europe) Limited,
CENTURION ISG SERVICES, LLC,
CENTURION ISG FINANCE GROUP, LLC,
CENTURION FUNDING SPV I LLC,
CENTURION FUNDING SPV II LLC,
GRACE HOLDINGS FINANCIAL, LLC,
PRIME SHORT TERM CREDIT INC.,

     Defendants.

THE ESTATE OF ERIC CHARLES HOLTZ,
SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC
F/K/A SEEMAN HOLTZ PROPERTY AND CASUALTY, INC.,
SHPC HOLDINGS I, LLC,

     Relief Defendants.

_____/

## NOTICE OF RELATED CASE AND FILING OF ORDER ESTABLISHING PROCEDURES GOVERNING RECOVERY ACTIONS TO BE COMMENCED BY THE RECEIVER

Daniel J. Stermer ("<u>Receiver</u>") for the property, assets and business of the thirty-three (33) Receivership-entities[1], by and through undersigned counsel, pursuant to Florida Rules of Judicial Administration 2545(d)(6) and the *Order Establishing Procedures Governing Recovery Actions to be Commenced by the Receiver* dated September 5, 2023 (the "<u>Procedures Order</u>"), hereby gives notice that this action is directly related to the following civil action pending in this judicial circuit that presents issues of fact and law common to this cause:

***State of Florida Office of Financial Regulation v. National Senior Insurance, Inc. d/b/a Seeman Holtz*, Case No. 50-2021-CA-008718-XXXX-MB**

The Receiver requests that this Court coordinate this instant case with the related litigation pursuant to the Procedures Order, which will significantly promote the efficient administration of justice, conserve judicial resources, avoid inconsistent results and prevent multiple court appearances by the parties on the same, similar or interwoven issues.

The Receiver hereby files the attached Procedures Order which is being filed in this action

---

[1] The Receivership entities include: NATIONAL SENIOR INSURANCE, INC. D/B/A SEEMAN HOLTZ, CENTURION INSURANCE SERVICES GROUP, LLC, EMERALD ASSETS 2018, LLC, INTEGRITY ASSETS 2016, LLC, INTERGRITY ASSETS, LLC, PARA LONGEVITY 2014-5, LLC, PARA LONGEVITY 2015-3, LLC, PARA LONGEVITY 2015-5, LLC, PARA LONGEVITY 2016-3, LLC, PARA LONGEVITY 2016-5, LLC, PARA LONGEVITY 2018-3, LLC, PARA LONGEVITY 2018-5, LLC, PARA LONGEVITY 2019-3, LLC, PARA LONGEVITY 2019-5, LLC, PARA LONGEVITY 2019-6, LLC, PARA LONGEVITY VI, LLC, SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC, VALENTINO GLOBAL HOLDINGS, LLC, AMERITONIAN ENTERPRISES, LLC, SEEMAN-HOLTZ CONSULTING CORP., CENTURION ISG Holdings, LLC, CENTURION ISG Holdings II, LLC, CENTURION ISG (Europe) Limited, CENTURION ISG SERVICES, LLC, CENTURION ISG FINANCE GROUP, LLC, CENTURION FUNDING SPV I LLC, CENTURION FUNDING SPV II LLC, PARA GLOBAL 2019, LLC, ALLOY ASSETS, LLC, SEEMAN HOLTZ WEALTH MANAGEMENT, INC., AGENCY ACQUISITION FUNDING, LLC, AMERICA'S FAVORITE INSURANCE SERVICES LLC, and GRACE HOLDINGS FINANCIAL, LLC.

12998640-1

as required by paragraph 4.B. of the Procedures Order.

DATED: May 9, 2024

Respectfully submitted,

BERGER SINGERMAN LLP
*Counsel for Receiver*
201 E. Las Olas Boulevard, Suite 1500
Fort Lauderdale, FL 33301
Tel. (954) 525-9900
Fax (954) 523-2872

By: /s/ *Gavin C. Gaukroger*

Brian G. Rich
Florida Bar No. 38229
brich@bergersingerman.com
Gavin C. Gaukroger
Florida Bar No. 76489
ggaukroger@bergersingerman.com
Michael J. Niles
Florida Bar No. 107203
mniles@bergersingerman.com
William O. Diab
Florida Bar No. 1010215
wdiab@bergersingerman.com

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 4 of 15

12998640-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 5 of 15

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CIVIL DIVISION**

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION,

      Plaintiff,

v.                          CASE NO.: 50-2021-CA-008718-XXXX-MB

NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
MARSHAL SEEMAN,
CENTURION INSURANCE SERVICES GROUP, LLC,
BRIAN J. SCHWARTZ,
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTERGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY 2019-6, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,
ALTRAI GLOBAL, LLC A/K/A ALTRAI HOLDINGS, LLC,
VALENTINO GLOBAL HOLDINGS, LLC,
AMERITONIAN ENTERPRISES, LLC,
SEEMAN-HOLTZ CONSULTING CORP.,
CENTURION ISG Holdings, LLC,
CENTURION ISG Holdings II, LLC,
CENTURION ISG (Europe) Limited,
CENTURION ISG SERVICES, LLC,
CENTURION ISG FINANCE GROUP, LLC,
CENTURION FUNDING SPV I LLC,
CENTURION FUNDING SPV II LLC,
GRACE HOLDINGS FINANCIAL, LLC,
PRIME SHORT TERM CREDIT INC.,

      Defendants.

12416620-1

THE ESTATE OF ERIC CHARLES HOLTZ,
SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC
F/K/A SEEMAN HOLTZ PROPERTY AND CASUALTY, INC.,
SHPC HOLDINGS I, LLC,

     Relief Defendants.

_____/

## ORDER ESTABLISHING PROCEDURES GOVERNING RECOVERY ACTIONS TO BE COMMENCED BY THE RECEIVER

**THIS CASE** having come before the Court on September 5, 2023 at 8:45 a.m., upon the *Receiver's Motion for Orders Establishing Procedures and Scheduling Order Governing Recovery Actions to be Commenced by the Receiver* (the "**Procedures Motion**"), filed by Daniel J. Stermer (the "**Receiver**"), by and through counsel, and pursuant to Fla. Civ. P. § 1.200 and §1.700, seeking the entry of procedures governing recovery actions to be filed by the Receiver; and this Court having jurisdiction to consider and determine the Procedures Motion and determining that the Procedures Motion is necessary and in the best interests of the Receivership Estates; and good cause existing;

     **It is ORDERED**:

     1.     The Procedures Motion is **GRANTED** as set forth in this Order.

     2.     The procedures that govern all Actions filed by the Receiver (the "**Actions**") are as follows.

     **A.**     **Effectiveness of Order**

     3.     This Order shall apply to all parties in the Actions.

     4.     This Order shall not alter, affect, impair or modify the rights of any such defendants, except as provided in this Order.

     **B.**     **Judge Assignment.** Upon the filing of an Action, the Receiver shall file with the complaint a copy of the Procedures Order establishing the Procedures in this Case. The clerk of

2

12416620-1

court shall direct all matters subject to the Procedures Order to be assigned to Judge Bradley Harper, Circuit Court Judge. Pursuant to the Order Appointing Receiver:

i.      The Clerk of the Court shall docket a Supplemental Proceeding under this matter's case number, and a separate Supplemental Proceeding number, and shall assign such supplemental proceeding to this Court's division.

ii.     All pleadings and other papers filed in a Supplemental Proceeding shall contain a separate sub-caption and the Supplemental Proceeding number in addition to the caption and the case number applicable to the main case.

### C.     <u>Mandatory Mediation</u>

5.      The parties to each of the Actions shall conduct and complete mandatory mediation within 90 days after each complaint is filed (the "**Mediation Deadline**"), provided, however, that the Receiver may, in his sole discretion, extend the Mediation Deadline without further Order of the Court for an additional thirty (30) days (so that extended mediations must be completed within one hundred and twenty (120) days after the filing of a complaint).

6.      Within thirty (30) days of entry of this Order, the Receiver shall identify a mediator that will serve as the default mediator for all of the Actions (the "**Mediator**"). If the Mediator has a scheduling conflict or if the Mediator has a conflict with respect to a particular defendant, then the Receiver shall, in his sole discretion, select another mediator to mediate such Proceeding. In the event a party objects to the Mediator or any other mediator selected by the Receiver, and are unable to come to an agreement on an alternate mediator, the parties shall notify the Court, which will ultimately decide the mediator for that particular Proceeding.

7.      On or before the Mediation Deadline, the Receiver, working with the mediator, will schedule mediations in Florida (or via Zoom or other electronic method). The defendants shall cooperate with the Receiver and the mediator regarding the scheduling of mediations. The Receiver's counsel shall contact the defendants with a list of proposed dates for mediation. Mediation will then be scheduled on a first-come, first-served basis.

12416620-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 8 of 15

8.    The mediator may request the parties submit position statements, any relevant papers and exhibits, and a settlement proposal in advance of the scheduled mediation.

9.    The fees of the mediator shall be split equally by the parties, and payment arrangements satisfactory to the mediator must be completed prior to the commencement of the mediation.

10.    The mediator will preside over the mediation with full authority to determine the nature and order of the parties' presentations. The mediator may implement additional procedures that are reasonable and practical under the circumstances.

11.    The length of time necessary to effectively complete the mediation will be within the mediator's discretion. The mediator may also adjourn a mediation that has been commenced if the mediator determines that an adjournment is in the best interest of the parties, provided that the mediation is concluded by the Mediation Deadline.

12.    The parties shall participate in the mediation, as scheduled and presided over by the mediator, in good faith and with a view toward reaching a consensual resolution. An authorized representative of the plaintiff and defendant with full settlement authority shall attend the mediation in person; provided, however, that the mediator, in her or his sole discretion, may allow such representative to appear telephonically, although the party's legal counsel is required to attend in person.

13.    If a party (a) fails to submit the submissions required by the mediator, (b) fails to timely pay any bill for the mediator's fees, or (c) fails to attend the mediation as required, then the non-defaulting party may file a motion for default judgment or a motion to dismiss the Proceeding, and in the case of a defendant's failure to pay the mediator's fees, the Receiver may withhold disbursement on account of any allowed claim filed the defendant.

14.    In addition, if the mediator feels that a party to the mediation is not attempting to

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B  Page 9 of 15

schedule or resolve the mediation in good faith, the mediator may file a report with the Court. The Court may, without need for further motion by any party, schedule a hearing. If the Court determines that the party is not cooperating in good faith with the mediation procedures, the Court may consider the imposition of sanctions including, but not limited to, entry of a default judgment or dismissal of the Proceeding. Additionally, if either party to the mediation is not attempting to schedule or resolve the mediation in good faith, then the opposite party may file a motion for sanctions with the Court including, but not limited to, entry of a default judgment or dismissal of the Proceeding. Litigation with respect to the issuance of sanctions shall not delay the commencement of mediation.

15.     Within five (5) business days after the conclusion of the mediation, the mediator will file a report (the "**Mediator's Report**"), drafted with the caption of the Proceeding, which need only state (i) the date that the mediation took place, (ii) the names of the parties and counsel that appeared at the mediation, and (iii) whether the Proceeding settled or the mediator declared an impasse (the "**Impasse Notice**").

16.     The mediator shall not be called as a witness by any party except as set forth in this paragraph. No party shall attempt to compel the testimony of, or compel the production of documents from, the mediators or the agents, partners, or employees of the mediator's law firm(s). Neither the mediators nor their respective agents, partners, law firms, or employees (i) are necessary parties in any proceeding relating to the mediation or the subject matter of the mediation, nor (b) shall be liable to any party for any act or omission in connection with any mediation conducted under this Order. Any documents provided to the mediator(s) by the parties shall be destroyed 30 days after the filing of the Mediator's Report, unless the Mediator is otherwise ordered by the Court. However, subject to court order, a mediator may be called as a witness by any party and may be compelled to testify on a limited basis in proceedings where it is alleged that

a party failed to comply with the mediation procedures set forth in this Order.

17. All proceedings and writings incident to the mediation shall be privileged and confidential, and shall not be reported or placed into evidence.

### D. **Compromises**

18. Compromises and settlements reached in the Actions shall be brought before the Court for approval.

### E. **Extension of Deadline to Answer or Otherwise Respond to Complaint**

19. The deadline for a defendant to file an answer or otherwise respond to the complaint shall be extended to the first business day that is the earlier of: (i) thirty (30) days from the date that the mediator files an Impasse Notice, or (ii) one hundred and twenty (120) days from the date that the summons is issued (the "**Response Deadline**").

### F. **Formal Discovery Stayed Until After Mediation**

20. Formal discovery in the Actions are stayed until the Response Deadline. On or after the Response Deadline, the parties may proceed with formal discovery, except for depositions of key witnesses who the Receiver believes have information relevant to more than one Proceeding ("**Key Witnesses**"). The Receiver will file a list of Key Witnesses within thirty (30) days of an order approving this Motion. The list of Key Witnesses can be modified from time to time by the Receiver, at his sole discretion, by filing an amended list with the Court. Any party that wishes to take the deposition of a Key Witness must attend the scheduled deposition of such Key Witness. The Receiver shall be responsible for coordinating the depositions of Key Witnesses. The parties shall use reasonable efforts to coordinate among themselves the order of inquirer and scope of inquiries of Key Witnesses so that the questioning is not repetitive or redundant. The discovery cutoff deadline shall be 30 days from the date the Court sets the Proceeding for trial. Except for the foregoing, the Florida Rules of Civil Procedure will remain in full force and effect with respect

6

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 11 of 15

to depositions.

**G.** **Pretrial Conferences Eliminated in Favor of Omnibus Hearings**

21.    The Court will not conduct individual pretrial conferences in each separate Action. Instead, the Receiver will schedule separate omnibus hearings. Initially, the omnibus hearings will be scheduled on a quarterly basis at the Court's convenience. If it becomes necessary or advisable, the Receiver may request that omnibus hearings be scheduled on a monthly basis or bi-monthly basis. All motions and other matters concerning the Actions will only be heard at the omnibus hearings.

## TRIAL AND PRETRIAL OBLIGATIONS

**H.** **Notice for Trial**

22.    After each of the Actions are at issue and ready to be set for trial, the Receiver shall file a notice of readiness for trial, identifying the Actions that are at issue and ready to be set for trial and identifying the common issues that may be tried together.

**I.** **Final Omnibus Hearing; Setting Trial**

23.    The Court will then set a final omnibus hearing (the "**Final Omnibus Hearing**"), at which time the Court will set the Actions for each round for trial and may enter a trial order with additional obligations for the parties, including with respect to exhibits and sworn declarations. All such deadlines required under the Florida Rules of Civil Procedure will be scheduled after the Final Omnibus Hearing pursuant to an order.

**J.** **Special Settings**

24.    If the attorney(s) trying an Action are from outside this district, or the parties or witnesses are from outside this district, or if some other reason that justifies a request to the court to specially set trial at a time or date certain, counsel shall request appropriate relief at the Final

7

Omnibus Hearing.

### K.  <u>Miscellaneous</u>

25.    To the extent of a conflict between the Court's local rules and this Order, this Order shall control.

26.    The deadlines and/or provisions contained in this Order may be extended and/or modified by the Court upon written motion and for good cause shown or by consent or the parties pursuant to stipulation, which needs to be filed with the Court but does not require a Court order.

### L.  <u>Notice of Right to Object to this Order</u>

27.    The Receiver shall serve a copy of the applicable Procedures Order with the complaint and initial summons in each Action.

28.    Each defendant shall have 14 days from date a complaint and summons is served to file and serve on the Receiver an objection to the Procedures Order, which shall state which specific provision of the Procedures Order defendant objects to and why.

29.    The Court reserves the ability to modify the terms of the Procedures Order as necessary.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida.

.

502021CA008718XXXXMB   09/05/2023
Bradley G. Harper   Circuit Judge
ADMINISTRATIVE OFFICE OF THE COURT

502021CA008718XXXXMB   09/05/2023
Bradley G. Harper
Circuit Judge

BRADLEY  HARPER
CIRCUIT COURT JUDGE

12416620-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 13 of 15

Copies to:

A. Gregory Melchior, Esq. and George Bedell, Esq.
Office of General Counsel
Florida Office of Financial Regulation
200 East Gaines Street
Tallahassee, Florida 32309
greg.melchior@flofr.gov
george.bedell@flofr.gov
*Attorneys for Plaintiff*

Scott A. Orth, Esq.
Law Offices of Scott Alan Orth
3860 Sheridan Street, Ste. A
Hollywood, FL 33021
scott@orthlawoffice.com
service@orthlawoffice.com
eserviceSAO@gmail.com
*Attorney for Defendant Marshal Seeman and Twenty-six Defendant Entities*

Daniel J. Stermer, Esq.
Development Specialists, Inc.
500 W. Cypress Creek Road, Suite 400
Fort Lauderdale, Florida 33309
dstermer@DSIConsulting.com
*Receiver*

Brian G. Rich, Esq. and Gavin C. Gaukroger, Esq.
Berger Singerman LLP
525 Okeechobee Boulevard, Suite 1250
West Palm Beach, FL 33401
brich@bergersingerman.com
ggaukroger@bergersingerman.com
*Attorneys for Receiver, Daniel J. Stermer*

Gary A. Woodfield, Esq.
*Nason Yeager Gerson Harris & Fumero, P.A.*
3001 PGA Boulevard, Suite 305
Palm Beach Gardens, FL 33410
gwoodfield@nasonyeager.com

9

12416620-1

sdaversa@nasonyeager.com
*Counsel for The Estate of Eric Charles Holtz*


Victoria R. Morris, Esq.
Andrew C. Lourie, Esq.
Kobre & Kim LLP
201 South Biscayne Boulevard, Suite 1900
Miami, FL 33131
Andrew.Lourie@kobrekim.com
Victoria.Morris@kobrekim.com
*Attorneys for Relief Defendant Seeman Holtz Property and Casualty LLC*

David L. Luikart III, Esq.
Hill, Ward & Henderson, P.A.
101 East Kennedy Boulevard, Suite 3700
Tampa, FL 33602
Dave.luikart@hwhlaw.com
Michelle.armstrong@hwhlaw.com
*Attorneys for Prime Short Term Credit, Inc.*

Joshua W. Dobin, Esq.
James C. Moon, Esq.
Meland Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, FL 33131
jdobin@melandbudwick.com
jmoon@melandbudwick.com
mramos@melandbudwick.com
*Attorneys for Teleios LS Holdings V DE, LLC and Teleios LS Holdings IV DE, LLC*

Bernard Charles Carollo, Jr., Esq.
John J. Truitt, Esq.
William Leve, Esq.
Vernon Litigation Group
8985 Fontana Del Sol Way
Naples, FL 34109
bcarollo@vernonlitigation.com
jtruitt@vernonlitigation.com
wleve@vernonlitigation.com
nzumaeta@vernonlitigation.com
*Attorneys for Edwin and Karen Ezrine, Intervenors and Tom Echolds, Interested Party*

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 14 of 15

12416620-1

Unique Code : CAA-FBH-BCAJJ-CBDCAJHGF-JCAFIF-B Page 15 of 15

Gary M. Murphree, Esq.
Brandy Abreu, Esq.
AM Law, LC
10743 SW 104th Street
Miami, FL 33186
gmm@amlaw-miami.com
babreu@amlaw-miami.com
mramirez@amlaw-miami.com
pleadings@amlaw-miami.com
*Attorneys for Zoe Seijas and Victor Seijas, Jr., Trustees of Victor Seijas Living Trust*

Harris J. Koroglu, Esq.
Shutts & Bowen LLP
200 South Biscayne Boulevard, Suite 4100
Miami, FL 33131
hkoroglu@shutts.com
*Attorneys for MCM 301 Yamato LLC*

12416620-1



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 6/6/2024 12:46:11 PM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CBDCCFHCA-JCAFII-A |
| **Case Number:** | 502024CA004345XXXAMB |
| **Case Docket:** | DCM DESIGNATION TO THE STREAMLINE TRACK WITH NON-JURY TRIAL ORDER |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

\*\*The web address shown above contains an embedded link to the verification page for this particular document.



Unique Code : CAA-FBH-BCAJJ-CBDCCFHCA-JCAFII-A Page 1 of 8

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION: "AE"
CASE NO.: 502024CA004345XXXAMB

DANIEL J STERMER,
      Plaintiff/Petitioner

vs.

WELLS FARGO BANK NA,
      Defendant/Respondent.

_____/

### ORDER IMPLEMENTING DIFFERENTIATED CASE MANAGEMENT PLAN, DESIGNATING CASE TO THE STREAMLINED TRACK, ORDER SETTING CALENDAR CALL AND CASE MANAGEMENT CONFERENCE AND DIRECTING PRETRIAL AND MEDIATION PROCEDURES
(DCMSNT)

**THIS MATTER** is a Circuit Civil case calling for a non-jury trial. Accordingly, it is:

**ORDERED AND ADJUDGED** that pursuant to Administrative Order 3.110 (as amended), this case is designated to the **STREAMLINED TRACK**. The deadlines established by this Order are to ensure the case is **disposed of within 12 months from the date of filing.** To that end, the following procedures and deadlines shall be strictly observed:

I. **SERVICE OF THIS ORDER, ACTIVE CASE MANAGEMENT AND NON-COMPLIANCE**

**Plaintiff/Petitioner is directed to serve this Order** upon each Defendant/Respondent with the Initial Complaint/Petition and Summons. The deadlines and procedures set forth herein are firm and may be modified only upon a showing of a good faith attempt to comply with the deadlines or demonstration of a significant change of circumstances and through the process established in the 15th Circuit's Administrative Order 3.110 (as amended).

The parties are expected to actively manage the case and to confer early and often to ensure compliance with this order and timely resolution of the case. The parties and counsel are expected to govern themselves at all times with a spirit of cooperation, professionalism, and civility. They are expected to accommodate each other whenever reasonably possible and eliminate disputes by reasonable agreements.

**Self-Represented/Pro se litigants** (i.e. those without counsel) are held to the same obligations imposed upon counsel.

**Motions to extend deadlines** must be filed *prior* to the deadline. Untimely motions will be denied absent compelling circumstances and showing of good cause.

**NONCOMPLIANCE WITH THIS ORDER, ABSENT A SHOWING OF GOOD CAUSE, MAY RESULT IN DISMISSAL OF THE ACTION, THE STRIKING OF PLEADINGS, WITNESSES, OR EXHIBITS, REMOVAL OF THE CASE FROM THE DOCKET, DEFAULT OR ANY OTHER APPROPRIATE**

\*\*\* FILED: PALM BEACH COUNTY, FL  JOSEPH ABRUZZO, CLERK. 05/14/2024 07:02:35 AM \*\*\*

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER, PALM BEACH COUNTY.
VISIT https://appsgp.mypalmbeachclerk.com/Services/EcertifyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT

Digitally signed by The Honorable Joseph Abruzzo
Date: 2024.06.06 12:47:06 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

**SANCTION.**

The failure to act in good faith and comply with this order must be reported, if not resolved through a conference of the parties and good faith conferral, by filing a **"Suggestion of Non-Compliance with Pre-Trial Order"** that must be set for hearing in a timely manner. The Suggestion must name the non-compliant person, describe the act of non-compliance, be served upon all parties and sent to the Court's chambers. Responses may only be submitted upon request of the Court. Failure to correct any non-compliance before the hearing may result in sanctions as described above. The parties will notify the Court immediately if non-compliance is cured; if cured more than 7 days before the hearing, the hearing may be cancelled.

II. <u>**SCHEDULING, CONTINUANCES AND PRETRIAL DEADLINES**</u>

**A CASE MANAGEMENT CONFERENCE and CALENDAR CALL will be held on May 9, 2025**. The parties must be ready to try the case by that day. The specific time of Case Management Conference, and procedures for conducting Calendar Call can be found on the Division's webpages at www.15thcircuit.com. The Calendar Call may be conducted in-person or by e-calendar.

The trial period begins the first business day of the immediately following week after the above-listed Case Management Conference and Calendar Call, unless otherwise described in the divisional instructions or by court order.

**TRIAL CONTINUANCES:** If a case cannot be ready for trial by the Calendar Call despite all good faith efforts, a motion to continue trial must be set for a Differentiated Case Management (DCM) Conference as described in the 15th Circuit's Administrative Order 3.110 (as amended) and the next paragraph. Any motion to continue the trial must comply with Fla. R. Civ. P. Rule 1.460, including that they are signed by the client. The Motion must be filed and the DCM Conference set no more than **30 DAYS** from the last defendant being served or as soon as circumstances giving rise to the need for a continuance becomes known and only for good cause. Every motion for a continuance must include a proposed Amended DCMO resetting each pretrial deadline that remains applicable and indicating the month the case can be ready for trial.

**DCM CONFERENCES:** DCM conferences are scheduled through the Circuit's Online Scheduling System under DCM- Case Management Conference Scheduling. No less than ten (10) days in advance of the DCM Conference the parties must file with the Clerk a Joint Status Report that:

1. Concisely updates the Court on the status of the case,
2. Identifies pending motions and other matters the Court needs to address, and
3. If applicable, provides a proposed revised pretrial schedule.

The parties must upload the Joint Status report at least 7 days in advance of a DCM Conference through the e-courtesy feature of the Circuit's Online Scheduling System. The parties are to be prepared at the DCM Conference to address the topics listed in Rule 1.200(a) and for the court, at its discretion, to hear or set for hearing any pending motions.

**The following deadlines (discussed in detail below) apply unless otherwise modified by the Court:**

Unique Code : CAA-FBH-BCAJJ-CBDCCFHCA-JCAFII-A Page 3 of 8

| | EVENTS | DESCRIPTION | COMPLETION DEADLINE |
|---|---|---|---|
| 1. | Service of Complaint | See Part III.A, infra | September 6, 2024 Service under extension is only by court order. |
| 2. | Pleading Amendments/ Adding parties | See Part III.B, infra | November 5, 2024 |
| 3. | Resolution of all motions/objections directed to the pleadings *(i.e. to dismiss or strike)* and pleadings closed * | See Part III.B, infra | November 5, 2024 |
| 4. | Expert Witnesses and Compulsory Examinations | See Part III.D, infra | March 25, 2025 |
| 5. | Witness & Exhibit Lists | See Part III.C, infra | March 25, 2025 |
| 6. | Rebuttal Witness Lists | See Part III.E, infra | April 4, 2025 |
| 7. | Filing Summary Judgment & *Daubert* Motions | See Part III.J, infra | April 9, 2025 |
| 8. | Discovery Cut-Off | See Part III.H, infra | April 9, 2025 |
| 9. | Pre-trial Meet & Confer | See Part III.I, infra | April 24, 2025 |
| 10. | Deposition Designations | See Part III.G, infra | April 29, 2025 |
| 11. | Deadline for Mediation | See Part IV, infra | April 29, 2025 |
| 12. | Deadline to hear ALL Motions | See Part III.J, infra | May 4, 2025 |
| 13. | Trial Ready Date ** | See Part II, supra | May 9, 2025 |

**Fla. R. Gen. Prac. & Jud. Admin. Rule 2.514 governs if any deadlines falls on a weekend or holiday.**

*The parties must expeditiously address any motions directed to the pleadings. Defensive motions under Rule 1.140 of the Fla. R. Civ. P., motions to extend time to file a defensive motion or pleading, and any other motion preventing the matter from being at issue shall be set for hearing within **five (5) days** of filing. The motion should be scheduled for hearing at the earliest date that the Court and parties are available.

**The Court reserves the authority to expedite the trial setting and amend the pretrial deadlines accordingly.

III.  **UNIFORM PRE-TRIAL PROCEDURE**

A.  **Timely Service and Defaults:**

Parties must make reasonable efforts to ensure speedy service. Each return of service must be separately filed for each defendant. If service is not completed within 90 days, an Order will be issued directing service by the **120 DAY DEADLINE**. Failure to comply will result in dismissal of the case or party for lack of service. Any motions to extend the deadline for service must specify why service could not have been effectuated, what is being done to effectuate service and request only that amount of additional time necessary.

Unique Code : CAA-FBH-BCAJJ-CBDCCFHCA-JCAFII-A Page 4 of 8

If all defendants become defaulted, a Motion for Default Final Judgment along with supporting documentation must be filed within **30 days** of the last default and set for hearing at the next available hearing time.

B. **Amendment of Pleadings, Motions Directed at Pleadings and Notice for Trial:**

Any Motions to Amend Pleadings to add parties must be filed no later than the first business day **180 DAYS AFTER THE CASE IS FILED.**

The parties must expeditiously address any other motions directed to the pleadings. Defensive motions under Rule 1.140 of the Fla. R. Civ. P., motions to extend time to file a defensive motion or pleading, and any other motion preventing the matter from being at issue must be set for hearing within **5 days** of filing to be heard at the earliest date that the Court and parties are available.

If the pleadings are not closed and the case not at issue **180 DAYS AFTER FILING**, the parties must appear for a DCM Conference to be noticed and held in accordance within the 15th Circuit's Administrative Order 3.110 (as amended) and Divisional Instructions located on the Circuit's website for the Division to which the case is assigned.

C. **Exhibits and Witnesses.** On the last business day no later than **45 DAYS PRIOR TO CALENDAR CALL**, the parties must exchange lists of all trial exhibits, names and addresses of all trial witnesses.

D. **Expert Witnesses and Compulsory Medical Examinations.** If Expert Witnesses or Compulsory Medical Examinations are anticipated, the Parties must confer and establish a schedule for completing related discovery, including deadlines for disclosures, written discovery, depositions and motions directed at Experts or Compulsory Medical Examiners that will result in the completion of Expert/CME Discovery and resolution of Motions directed at them at least **45 DAYS BEFORE TRIAL**.

If agreed, the parties must submit a proposed Expert/CME Scheduling Order for entry by the Court. If not, the parties must appear for a DCM Case Management Conference.

**Expert Disclosures:** In addition to names and addresses of each expert retained to formulate an expert opinion with regard to this cause, both on the initial listing and on rebuttal, the parties must provide:

1. The subject matter about which the expert will testify;
2. The substance of facts and opinions to which the expert will testify;
3. A summary of the grounds for each opinion;
4. A copy of any written reports issued by the expert; and
5. A copy of the expert's curriculum vitae.

**One Expert Per Specialty:** The parties will be limited to one expert witness per specialty unless they obtain leave of Court to list and call more than one expert witness per specialty, no later than 60 days prior to calendar call.

E. **Rebuttal Witnesses and Exhibits.** On the last business day no later than **35 DAYS PRIOR TO CALENDAR CALL**, the parties must exchange lists of names and

addresses of all rebuttal witnesses and lists of any rebuttal exhibits.

F. **Additional Exhibits, Witnesses Or Objections.** At trial, the parties will be strictly limited to exhibits and witnesses disclosed and objections reserved on the schedules attached to the Pre-Trial Stipulation prepared in accordance with paragraphs D and E, absent agreement specifically stated in the Pre-Trial Stipulation or order of the Court upon good cause shown. Failure to reserve objections constitutes a waiver. A party desiring to use an exhibit or witness discovered after counsel have conferred pursuant to paragraph D must immediately furnish the Court and other counsel with a description of the exhibit or with the witness' name and address and the expected subject matter of the witness' testimony, together with the reason for the late discovery of the exhibit or witness. Use of the exhibit or witness may be allowed by the Court for good cause shown or to prevent manifest injustice.

G. **Deposition Designations.** No later than **10 DAYS PRIOR TO CALENDAR CALL**, each party must serve designation of depositions, or portions of depositions, each intends to offer as testimony. No later than **8 DAYS PRIOR TO CALENDAR CALL**, each opposing party is to serve any counter (or "fairness") designations to portions of depositions designated, together with objections to the depositions, or portions thereof, originally designated. No later than **5 DAYS BEFORE** calendar call, each party must serve any objections to counter designations served by an opposing party.

H. **Discovery Cutoff.** Unless otherwise agreed in the Pre-Trial Stipulation, all discovery must be completed no later than **30 DAYS PRIOR TO CALENDAR CALL** absent agreement for later discovery specifically stated in the Pre-Trial Stipulation or for other good cause shown. Absent unforeseeable, exigent circumstances, the failure to complete discovery is not grounds for a continuance.

I. **Pre-Trial Meet and Confer**. On the last business day no later than **15 DAYS PRIOR TO CALENDAR CALL**, the parties must confer and:

1. Discuss settlement;
2. Simplify the issues and stipulate, in writing, as to as many facts and issues as possible;
3. Prepare a Pre-Trial Stipulation in accordance with paragraph K; and
4. List all objections to trial exhibits.

J. **Motions:** The Parties must plan for, file and timely set hearings for any motions they expect the Court to address in advance of trial. **No motions will be heard the day of trial**. Few are appropriate after Calendar Call. The parties must confer early in the case and coordinate briefing and discovery schedules, as necessary, to ensure motions are timely heard.

While motion practice is critical to the advancement and streamlining of a case, the Parties are reminded they **DO NOT have an absolute right to most motions being heard**. Failure to timely file and set motions for hearing in advance of Calendar Call will likely result in the Court denying a request for hearing. Failure to file and have a motion heard is not grounds for a trial continuance.

**Summary Judgment and *Daubert* Motions** must be filed at least **30 DAYS prior**

Page **5** of **8**

Unique Code : CAA-FBH-BCAJJ-CBDCCFHCA-JCAFII-A Page 6 of 8

to **Calendar Call**. The parties shall confer regarding summary judgment motions to ensure discovery necessary for those motions is completed in advance of their filing.

**ALL MOTIONS** (including dispositive motions to motions in limine), must be heard no less than **5 days before Calendar Call**. Parties must plan and seek hearing time sufficiently in advance to ensure this deadline is met.

The Court reminds the parties that unless an advance ruling will assist in preparation and reduction of hearing time, Motions in Limine and Daubert Motions at bench trials typically duplicate judicial effort.

K. **Filing of Pre-Trial Stipulation.** It is the duty of counsel for the Plaintiff to see that the Pre-Trial Stipulation is drawn, executed by counsel for all parties, and filed with the Clerk no later than **15 DAYS PRIOR TO CALENDAR CALL**. Unilateral pretrial statements are disallowed, unless approved by the Court, after notice and hearing showing good cause. Counsel for all parties are charged with good faith cooperation in this regard. The Pre-Trial Stipulation must contain in separately numbered paragraphs:

   1. A list of all pending motions including *Motions in Limine* and *Daubert* Motions requiring action by the Court and the dates those motions are set for hearing. **Motions not listed are deemed waived**.
   2. Stipulated facts requiring no proof at trial which may be read to the trier of fact;
   3. A statement of all issues of fact for determination at trial;
   4. Lists of exhibits itemized as follows:
      a. Exhibits to be admitted by Plaintiff without objection;
      b. Exhibits to be admitted by Defendant without objection;
      c. Objected to Exhibits, with the specific basis for the objection stated

      Note: Reasonably specific description of each exhibit is required. Non-specific descriptions like "all documents produced in discovery" will be stricken. Moreover, Objections may not be "reserved." Failure to specify an objection constitutes its waiver.
   5. Each party's numbered list of trial witnesses with addresses (including all known rebuttal witnesses); the list of witnesses must be on separate schedules attached to the Stipulation;
   6. A statement of total estimated time for trial, including the time needed per side for (1) opening arguments, (2) each case in chief, and (3) closing arguments.
   7. Names of attorneys to try case and their contact information.

   Failure to file the Pre-Trial Stipulation or a Court Approved Unilateral Stipulation as provided above may result in the case being stricken from the Court's calendar or other sanctions, including dismissal or default.

L. **Pre-Trial Conference pursuant to Fla. R. Civ. P. 1.200** If a pre-trial conference is set upon motion of a party or by the Court, counsel must meet and prepare a

stipulation pursuant to paragraph K, infra, and file the stipulation no later than **5 DAYS BEFORE THE CONFERENCE**. Failure to request a pre-trial conference in a timely fashion constitutes a waiver of the notice of requirement of Rule 1.200. Absent prior approval, Motions for Summary Judgment will not be heard at any pre-trial conference.

M. **Pre-Marking Exhibits.** Prior to trial, each party is to mark for identification all exhibits, as directed by the clerk. (instructions and templates found at www.mypalmbeachclerk.com/departments/courts/evidence-guidelines/civil-evidence)

N. **Unique Questions Of Law.** Prior to calendar call, counsel for the parties are directed to exchange and simultaneously submit to the Court appropriate memoranda with citations to legal authority in support of any unique legal questions that may reasonably be anticipated to arise during the trial.

IV. **MEDIATION**

A. All parties are required to participate in mediation as follows:

1. The attendance of counsel who will try the case and representatives of each party with full authority to enter into a complete compromise and settlement is mandatory. If insurance is involved, an adjuster with authority up to the policy limits must attend.

2. At least one week prior to a scheduled mediation conference, all parties are to file with the mediator a brief, written summary of the case containing a list of issues as to each party.

3. All communications at the mediation conference are privileged consistent with Florida Statutes sections 44.102 and 90.408.

4. The mediator has no power to compel or enforce a settlement agreement. If a settlement is reached, it is a responsibility of the attorneys or parties to reduce the agreement to writing and to comply with Florida Rule of Civil Procedure 1.730(b), unless waived.

B. The Plaintiff's attorney is responsible for scheduling mediation. The parties should agree on a mediator. If they are unable to agree, any party may apply to the Court for appointment of a mediator in conformity with Rule 1.720 (j), Fla. R. Civ. P. The lead attorney or party must file and serve on all parties and the mediator a Notice of Mediation giving the time, place, and date of the mediation and the mediator's name.

C. **Completion of mediation prior to calendar call is a prerequisite to trial and must be completed no later than 10 DAYS PRIOR TO CALENDAR CALL.** If mediation is not conducted, or if a party fails to participate in mediation, the case, at the Court's discretion, may be stricken from the trial calendar, pleadings may be stricken, and other sanctions may be imposed.

D. Any party opposing mediation may proceed under Florida Rule of Civil Procedure 1.700(b).

**DONE AND ORDERED** in West Palm Beach, Palm Beach County, Florida.

Unique Code : CAA-FBH-BCAJJ-CBDCCFHCA-JCAFII-A Page 7 of 8



50-2024-CA-004345-XXXA-MB      05/14/2024
Bradley G. Harper
Circuit Judge

A copy of this Order has been furnished to the Plaintiff. The Plaintiff shall serve this Order to the Defendant(s) in compliance with Administrative Order 3.110 (amended).

This notice is provided pursuant to Administrative Order No. 2.207-7/22

"**If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**"

"**Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711.**"

"**Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711.**"

Unique Code : CAA-FBH-BCAJJ-CBDCCFHCA-JCAFII-A Page 8 of 8



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 6/6/2024 12:45:12 PM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CBDCAJIGE-JCAFIH-I |
| **Case Number:** | 502024CA004345XXXAMB |
| **Case Docket:** | PAID $411.00 ON RECEIPT 5325851 |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

**The web address shown above contains an embedded link to the verification page for this particular document.





**JOSEPH ABRUZZO**

CLERK OF THE CIRCUIT COURT & COMPTROLLER

PALM BEACH COUNTY, FLORIDA

# RECEIPT

5325851

Printed On:
05/13/2024 12:09
Page 1 of 1

Unique Code : CAA-FBH-BCAJ-CBDCAJIGE-JCAFIH-I Page 1 of 1

| Receipt Number: 5325851 - Date 05/13/2024  Time 12:09PM | |
|---|---|
| **Received of:** | BSLLP 5564 E-FILING<br>201 E. Las Olas Blvd., Suite 1500<br>Fort Lauderdale, FL 33301 |

| | | | |
|---|---|---|---|
| **Cashier Name:** | ADMIN | **Balance Owed:** | 411.00 |
| **Cashier Location:** | E-Filing | **Total Amount Paid:** | 411.00 |
| **Receipt ID:** | 11731722 | **Remaining Balance:** | 0.00 |
| **Division:** | AE: Circuit Civil Central - AE(Civil) | | |

| Case# 50-2024-CA-004345-XXXA-MB -- PLAINTIFF/PETITIONER: STERMER, DANIEL J | | | |
|---|---|---|---|
| Item | Balance | Paid | Bal Remaining |
| Fees | 411.00 | 411.00 | 0.00 |
| **Case Total** | **411.00** | **411.00** | **0.00** |

| Payments | | |
|---|---|---|
| **Type** | **Ref#** | **Amount** |
| EFiling_ACH | 11197224 | **411.00** |
| **Total Received** | | **411.00** |
| **Total Paid** | | **411.00** |

**How was your service today?**  Please visit www.mypalmbeachclerk.com/survey or send your feedback to clerkweb@mypalmbeachclerk.com.

**For office locations and information about Clerk & Comptroller services:**
Visit www.mypalmbeachclerk.com or call (561) 355-2996.

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER, PALM BEACH COUNTY.

VISIT https://appsgp.mypalmbeachclerk.com/Services/EcertifyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT



Digitally signed by The Honorable Joseph Abruzzo
Date: 2024.06.06 12:46:05 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401



# Electronically Certified Court Record

This is to certify that this is a true and correct copy of the original document, which may have redactions as required by law.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Clerk of the Circuit Court & Comptroller, Palm Beach County |
| **Clerk of the Circuit Court:** | The Honorable Joseph Abruzzo |
| **Date Issued:** | 6/6/2024 12:45:07 PM |
| **Unique Reference Number:** | CAA-FBH-BCAJJ-CBDCAJHGG-JCAFIG-H |
| **Case Number:** | 502024CA004345XXXAMB |
| **Case Docket:** | SUMMONS ISSUED |
| **Requesting Party Code:** | 517 |

## CERTIFICATION

Pursuant to Sections 90.955(1) and 90.902(1), Florida Statutes, and Federal Rules of Evidence 901(a), 901(b)(7), and 902(1), the attached document is electronically certified by The Honorable Joseph Abruzzo, Clerk of the Circuit Court & Comptroller, Palm Beach County, to be a true and correct copy of an official record or document authorized by law to be recorded or filed and actually recorded or filed in the office of the Clerk of the Circuit Court & Comptroller, Palm Beach County. The document may have redactions as required by law.

## HOW TO VERIFY THIS DOCUMENT

This electronically certified document contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and tamper-evident seal validating this document as a true and accurate copy of the original recorded. To view the tamper-evident seal and verify the certifier's digital signature, open this document with Adobe Reader software. Instructions for verifying this instrument are available for customers in the USA and Canada and for customers in other countries.

\*\*The web address shown above contains an embedded link to the verification page for this particular document.



Unique Code : CAA-FBH-BCAJ-CBDCAJHGG-JCAFIG-H Page 1 of 4

**IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT**
**IN AND FOR PALM BEACH COUNTY, FLORIDA**
**CIVIL DIVISION**

DANIEL J. STERMER, as Receiver for        CASE NO. _____
NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
CENTURION ISG SERVICES, LLC
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,
PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,

       Plaintiffs,

v.

WELLS FARGO BANK, N.A.,

       Defendant.
_____/

STATE OF FLORIDA
OFFICE OF FINANCIAL REGULATION,

     Plaintiff,

v.                           CASE NO.: 50-2021-CA-008718-XXXX-MB

NATIONAL SENIOR INSURANCE, INC.
D/B/A SEEMAN HOLTZ,
MARSHAL SEEMAN,
CENTURION INSURANCE SERVICES GROUP, LLC,
BRIAN J. SCHWARTZ,
EMERALD ASSETS 2018, LLC,
INTEGRITY ASSETS 2016, LLC,
INTEGRITY ASSETS, LLC,
PARA LONGEVITY 2014-5, LLC,
PARA LONGEVITY 2015-3, LLC,
PARA LONGEVITY 2015-5, LLC,

12998689-1

FILED: PALM BEACH COUNTY, FL, JOSEPH ABRUZZO, CLERK, 05/09/2024 04:36:39 PM

I HEREBY CERTIFY THAT THIS DOCUMENT IS A TRUE AND CORRECT COPY OF A DOCUMENT
THAT WAS FILED AS A COURT RECORD WITH THE CLERK OF THE CIRCUIT COURT & COMPTROLLER,
PALM BEACH COUNTY.

VISIT https://appsgp.mypalmbeachclerk.com/Services/EcertifyService/Helper/VerifyImage.html TO VALIDATE THIS DOCUMENT



Digitally signed by The Honorable Joseph Abruzzo
Date: 2024.06.06 12:45:08 -04:00
Clerk of the Circuit Court & Comptroller, Palm Beach County
Location: 205 N. Dixie Highway, West Palm Beach, FL 33401

Unique Code : CAA-FBH-BCAJ-CBDCAJHGG-JCAFIG-H Page 2 of 4

PARA LONGEVITY 2016-3, LLC,
PARA LONGEVITY 2016-5, LLC,
PARA LONGEVITY 2018-3, LLC,
PARA LONGEVITY 2018-5, LLC,
PARA LONGEVITY 2019-3, LLC,
PARA LONGEVITY 2019-5, LLC,
PARA LONGEVITY 2019-6, LLC,
PARA LONGEVITY VI, LLC,
SH GLOBAL, LLC N/K/A PARA LONGEVITY V, LLC,
ALTRAI GLOBAL, LLC A/K/A ALTRAI HOLDINGS, LLC,
VALENTINO GLOBAL HOLDINGS, LLC,
AMERITONIAN ENTERPRISES, LLC,
SEEMAN-HOLTZ CONSULTING CORP.,
CENTURION ISG Holdings, LLC,
CENTURION ISG Holdings II, LLC,
CENTURION ISG (Europe) Limited,
CENTURION ISG SERVICES, LLC,
CENTURION ISG FINANCE GROUP, LLC,
CENTURION FUNDING SPV I LLC,
CENTURION FUNDING SPV II LLC,
GRACE HOLDINGS FINANCIAL, LLC,
PRIME SHORT TERM CREDIT INC.,

     Defendants.

THE ESTATE OF ERIC CHARLES HOLTZ,
SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC
F/K/A SEEMAN HOLTZ PROPERTY AND CASUALTY, INC.,
SHPC HOLDINGS I, LLC,

     Relief Defendants.

_____/

## **SUMMONS**

**THE STATE OF FLORIDA**

To All Singular Sheriffs of Said State

**YOU ARE HEREBY COMMANDED** to serve this Summons, and a copy of the Complaint, in the above-styled cause upon the Defendant:

**WELLS FARGO BANK, N.A.**
c/o Corporation Service Company, Registered Agent
1201 Hays Street
Tallahassee, FL 32301-2525

12998689-1

Unique Code : CAA-FBH-BCAJ-CBDCAJHGG-JCAFIG-H Page 3 of 4

Defendant is required to serve written defenses to Complaint on Plaintiff's attorney, to-wit: **GAVIN C. GAUKROGER, ESQ.,** whose address is: **BERGER SINGERMAN LLP, 201 E. LAS OLAS BOULEVARD, SUITE 1500, FORT LAUDERDALE, FL 33301**, within (20) days after service of this summons on the Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.  If the Defendant fails to do so, a default will be entered against the Defendant for the relief demanded in the Complaint.

WITNESS my hand and seal of said Court this _____ day of <u>May 13 2024</u> _____, 2024.

(Court Seal)

JOSEPH ABRUZZO,
as Clerk of said Court

By:_____
as Deputy Clerk

**GINA BRIMMER, D.C.**

This notice is provided pursuant to Administrative Order No. 2.207-7/22

**"If you are a <u>person with a disability</u> who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact William Hutchings, Jr., Americans with Disabilities Act Coordinator, Palm Beach County Courthouse, 205 North Dixie Highway West Palm Beach, Florida 33401; telephone number (561) 355-4380 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**"Si usted es una <u>persona minusválida</u> que necesita algún acomodamiento para poder participar en este procedimiento, usted tiene derecho, sin tener gastos propios, a que se le provea cierta ayuda. Tenga la amabilidad de ponerse en contacto con William Hutchings, Jr., 205 N. Dixie Highway, West Palm Beach, Florida 33401; teléfono número (561) 355-4380, por lo menos 7 días antes de la cita fijada para su comparecencia en los tribunales, o inmediatamente después de recibir esta notificación si el tiempo antes de la comparecencia que se ha programado es menos de 7 días; si usted tiene discapacitación del oído o de la voz, llame al 711."**

**"Si ou se yon <u>moun ki enfim</u> ki bezwen akomodasyon pou w ka patisipe nan pwosedi sa, ou kalifye san ou pa gen okenn lajan pou w peye, gen pwovizyon pou jwen kèk èd. Tanpri kontakte William Hutchings, Jr., kòòdonatè pwogram Lwa pou ameriken ki Enfim yo nan Tribinal Konte Palm Beach la ki nan 205 North Dixie Highway, West Palm Beach, Florida 33401; telefòn li se (561) 355-4380 nan 7 jou anvan dat ou gen randevou pou parèt nan tribinal la, oubyen imedyatman apre ou fin resevwa konvokasyon an si lè ou gen pou w parèt nan tribinal la mwens ke 7 jou; si ou gen pwoblèm pou w tande oubyen pale, rele 711."**

3

12998689-1

Unique Code : CAA-FBH-BCAJ-CBDCAJHGG-JCAFIG-H Page 4 of 4

**IMPORTANTE**

Usted ha sido demandado legalmente. Tiene 20 días, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una Hamada telefónica no lo protegerá. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el número del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podría ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.

Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede Hamar a una de las oficinas de asistencia legal que aparecen en la guía telefónica. Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, deberá usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiffs Attorney" (Demandante o Abogado del Demandante).

**IMPORTANT**

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de !'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. 11 ya d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones). Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

12998689-1